Wisconsin Granite Company, Respondent, vs. Industrial Commission and another, Appellants.

*December 11, 1931—June 20, 1932.*

For the appellants there were briefs by *Grotophorst, Quale & Langer* of Baraboo, attorneys for Matilda Swafford individually and as administratrix, and the *Attorney General* and *Mortimer Levitan,* assistant attorney general, attorneys for the Industrial Commission, and oral argument by *Mr. Langer* and *Mr. Levitan.*

For the respondent there were briefs by *Richmond, Jackman, Wilkie & Toebaas* of Madison and *Lowell A. Lawson*

of Chicago, Illinois, and oral argument by *F. Halsey Kraege* of Madison and *Harold M. Wilkie*.

The following opinion was filed April 5, 1932:

OWEN, J. For many years John Swafford was in the employ of the Wisconsin Granite Company. While so employed he was exposed to and breathed stone or granite dust containing silica, because of which he became afflicted with the occupational disease known as pneumoconiosis. The plant where he worked shut down for repairs on December 4, 1928. He experienced symptoms of the disease a short time before it shut down on December 4th, but the disease was not identified until after that date, and disability did not result from the disease until December 18, 1928, during the period of the shutdown. He died April 13, 1930. Thereafter Matilda Swafford, his widow, made claim for compensation under the workmen's compensation act. Compensation was awarded her by the Industrial Commission by order dated December 4, 1930. This action was brought in the circuit court for Dane county for the purpose of procuring a vacation of said award. The award was vacated by the judgment of the circuit court, and the case is here upon appeal from that judgment.

This appeal presents another troublesome question arising from the necessity of administering compensation for occupational disease under a law providing compensation for industrial accidents. The state of our statutory law in relation to this subject has given rise to numerous troublesome questions, as will be seen by a reference to the case of *Zurich Gen. Acc. & L. Ins. Co. v. Industrial Comm.* 203 Wis. 135, 233 N. W. 772, and cases therein cited. We are here confronted with another phase of the question presenting the same difficulty dealt with in those cases. The award in this case, which was made prior to the decision in the *Zurich*

*Case, supra,* found that both employer and employee were subject to the provisions of the workmen's compensation act between August 31, 1925, and December 4, 1928, but found that disability, which under the decision of the *Zurich Case* is to be deemed the date of the accident, occurred on December 18, 1928. The evidence shows that the plant was closed down for repairs on December 4, 1928, for which reason the employee rendered no services for his employer between December 4th and December 18th, and that he was in fact rendering no services for his employer on December 18, 1928, the first date of disability, or the date of the accident under the doctrine of the *Zurich Case.*

The circuit court evidently vacated the award on the assumption that such action was necessitated by the fact that at the time of the accident the employee was not "performing service growing out of and incidental to his employment," as required by the provisions of sec. 102.03 (2), Stats. This is a condition of liability that has been in our workmen's compensation statute from the beginning and defines the situations that must concur in order to give rise to an industrial accident. This was a very appropriate provision so long as compensation was confined to industrial accidents. However, when occupational disease was made compensable under machinery and pursuant to provisions set up for the compensation of industrial accidents, the arising of anomalous situations became inevitable.

While occupational disease as well as industrial accident is a part of the expense and ravage of industry, the manner in which disability from the former on the part of employees is brought about is so inherently different that any attempt to administer the law with respect to the one under machinery adapted to the other can but produce botch and patchwork results. However, the administrative officers and the judicial department must strive as best they may with

the machinery placed at their disposal, to secure the results which the legislature manifestly intended should be accomplished.

It is quite apparent that if in order to award compensation for occupational disease the employee must be performing service growing out of and incidental to his employment at the very moment that disability occurs as the result of years of inoculation which gives rise to the occupational disease, then in many instances occupational disease must go uncompensated under our statutes. It means that if an employee is stricken in the nighttime, on Sunday, or on a holiday, so that he cannot drag himself back to his employment, where he may abandon his bench or his tools as a result of disability, he is not entitled to compensation for occupational disease. Plainly such a situation is utterly repugnant to the manifest purpose of the legislature to provide compensation for occupational disease. Occupational disease, unlike an accident, does not strike in a moment of time. It gradually gathers its force and power within the human system throughout the years. It comes as a growth and development which eventually overcomes its victim and brings about ultimate incapacity. In order to constitute occupational disease a ravage which justifies the burdening of industry with its consequences, there is no apparent reason why the ultimate disability should be held to have occurred at the moment when the employee was "performing service growing out of and incidental to his employment." This is not true of industrial accidents. To charge industry with the burden resulting from accident, the accident should be the result of industry, and in order to be such it is necessary that the employee at the time of the accident be in the performance "of service growing out of and incidental to his employment."

We are therefore confronted with two obviously repugnant provisions in our workmen's compensation act. The

one is sec. 102.35, Stats. 1929, which provides that "the provisions of sections 102.01 to 102.34 [workmen's compensation act], both inclusive, are extended so as to include, in addition to accidental injuries, all other injuries, including occupational diseases, growing out of and incidental to the employment." The other is sec. 102.03 (2), to which reference has already been made, requiring as a condition of liability that "at the time of the accident the employee is performing service growing out of and incidental to his employment." Sec. 102.35 was added to the compensation act by ch. 668, Laws of 1919. It is apparent that by this amendment the legislature intended the accomplishment of some purpose. That it was the legislative intent to compensate occupational disease there can be no question. If this obvious purpose comes into collision with a provision of the .act the literal application of which will defeat the legislative purpose of providing compensation for occupational disease, we are confronted with a problem of statutory construction.

The most salient principle of statutory construction is to give effect to the obvious legislative intent. To accomplish this end is one of the gravest duties of the judiciary. The duty and power of courts in this respect was comprehensively considered in *State ex rel. McGrael v. Phelps,* 144 Wis. 1, at p. 8 (128 N. W. 1041). In the opinion in that case it was said:

"If it were not for judicial power to give effect to ideas, however obscurely expressed, if yet not so hidden as to be undiscoverable,—in view of the objects designed to be attained, the circumstances dealt with, the consequences of a literal or too literal interpretation, and many other lights that may be mentioned,—and not so out of harmony with the sense of the language used as not to be readable therefrom; giving thereto the widest reasonable scope; supplying all words reasonably suggested as in place by those used; eliminating or changing those clearly improperly used and transposing words or clauses, if necessary, from proper to improper locations,—much legislation would fail."

Among other things it was said in that opinion that "A thing which is within the intention of the makers of the statute is as much within the statute as if it were within the letter." And conversely: "A thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers." Again, it is said:

"It must be presumed as to a written law that some sensible legal end and some sensible legal means of accomplishing that end were in view. Therefore, regardless of how crude and obscure may be the forms of expression used by the legislature, the court should not tire of searching for its purpose and some sensible way of so translating the legislative language as to express it, without having exhausted all judicial power to that end."

As an illustration of the length to which a court may go in giving effect to the legislative intent, the opinion in *Neacy v. Supervisors of Milwaukee County,* 144 Wis. 210, 128 N. W. 1063, was cited, and of that case it was said:

"A word expressing an idea, very obscurely, considering its location, was expanded by the addition of other words, the whole then transferred to its proper location as a qualifying clause, and another clause was transposed to its proper location, so that the collection of words which, read literally, was senseless, was made to serve the purpose intended."

The dominant legislative purpose in adopting ch. 668, Laws of 1919, plainly was to compensate occupational diseases growing out of and incidental to the employment. That legislative purpose should not be destroyed by the literal application of a provision which had a sensible and appropriate place in the law so long as it was limited to compensation for industrial accidents. To permit such a provision to defeat the later manifest legislative purpose would approach a betrayal of judicial duty.

It seems plain that the legislature never intended that the exact date of incapacity should have a controlling influence

upon the question of whether an employee afflicted with an occupational disease should be compensated therefor. We cannot impute to the legislature the purpose of saying in one breath that occupational disease shall be compensated and in another that a provision written into the statute having a just and material bearing upon an industrial accident shall be invoked for the purpose of denying compensation to the employee suffering from occupational disease when such provision has no legitimate or moral bearing upon the right of the employee to be compensated for such disease. This thought is further strengthened by the express language of sec. 102.35, Stats., which provides that "occupational disease growing out of and incidental to the employment" shall be compensated. Certainly this does not indicate any legislative thought that at the date of the accident, which we have been compelled to hold, in order to determine upon whom liability rests, is the date of incapacity from occupational disease, the employee shall be performing service growing out of and incidental to his employment. We therefore arrive at the conclusion that it is not necessary, in order to entitle the employee to compensation for occupational disease, that his incapacity by reason of such disease must arise at a time when he is performing service growing out of and incidental to his employment.

Having thus concluded, we are still confronted with a problem no less confusing, and that is, if the employee may be compensated notwithstanding his incapacity did not result at a time when he was performing service for his employer, what conditions must exist in order to entitle him to recover? It is easy to agree that he should be entitled to recover if he is stricken during the nighttime, or on a holiday, or on Sunday, at a time when he is not performing service for his employer. But is it so apparent that he should be entitled to recover if stricken during a two weeks' vacation, or during

the time when the plant is shut down for repairs for a period of three or four weeks, during which time the employees are not at work? Here arises a question concerning which the legislature cannot escape just censure. The circumstances under which the employee should be permitted to recover is a matter peculiarly within the field of legislative discretion, and to discover its purpose on this subject we must grope in deep twilight. The English compensation act distinctly declares that the employee shall be entitled to compensation if he was an employee within twelve months previous to the date of disablement or suspension. Some such legislative declaration is not only proper but necessary to assure an administration of the act in conformity with the legislative intent.

As we have determined, however, that the employee is entitled to compensation for occupational disease even though he may not be stricken while actually engaged in performing services for his employer, we cannot discontinue our further efforts to discover the conditions under which the legislature did intend the employee should have compensation. No one would say that the legislature did not intend to accord the employee compensation if he was stricken during his regular absences from his employment, such as nighttime, Sundays, or holidays. We would intuitively agree that the legislature so intended. But when we agree to that and recognize that his performance of labor need not concur with the date of his disability, then the question presses, What did the legislature intend? We think it cannot depend upon the length of time alone during which he was absent from his employment. We must search for underlying and more fundamental principles by which that question is to be determined. We think we cannot go farther than to say that under existing statutes the employee is entitled to be compensated if at the time of the disability the relation of employer and employee existed. By that we do not mean a

relation existing by virtue of an express contract. Where the relation exists by virtue of an express contract defining the term of the employment, there is no difficulty in holding that the employee who suffers disability from an occupational disease during the period of the contract is in the employ of his master, whether on vacation or at work. It is the existence of a status or relationship which is determinative of that question. We have no difficulty in those cases in which a definite period of employment is contracted for, because we can see both boundary lines of the employment by examining the contract which gives rise to the relationship. In those cases where the employment is indefinite in duration, the boundary of this status or relationship is not so definite. But there are many considerations which indicate that the relationship embraces a greater period of time than that covered by the period of actual service rendered by the employee to his employer. Statutes, both federal and state, which attempt to regulate picketing and other activities both on the part of the employer and employee at a time when in the technical legal sense the relation no longer exists, are based upon considerations of that kind. The fact that the relationship has assumed the nature of a status received legislative recognition at the special session of the last legislature, which enacted ch. 20, relating to unemployment reserves and compensation. This is an act to impose upon employers the payment of compensation to "unemployed employees," as expressed in the act. The act also speaks of employees "available for work" and "an employee thus unemployed." We thus see that the law, in some of its contemplations at least, recognizes the employer-employee status or relationship existing at times other than when some service is actually being rendered by the employee, and attempts to impose upon the employer certain responsibilities for the welfare of the employee even when not so employed. The workmen's compensation act, sec. 102.07, defines "employee"

as "every person in the service of another under any contract of hire, express or implied, oral or written," not within certain exceptions. Under this act the status or relationship must be established by contract, express or implied, oral or written. It is the initial contract that establishes the status. But when this status is once established, how long does it continue and how may it be terminated? That the status does not exist except during the period of working hours, when the employee is rendering actual service to the employer, is repugnant to any social or economic conception of the relation. The relation once established should be presumed to continue until affirmative proof has been produced that it has been terminated. When the employee leaves work Saturday night with the intention of returning to work Monday morning, the relation continues. Similarly, if the work of the employer is suspended temporarily for repair of the plant, or any similar reason, the relation continues to exist in the absence of an affirmative termination thereof by one of the parties, where it is assumed and expected that the employee will return to work when the employer's work is resumed. In short, the status once established will be presumed to continue until terminated by the affirmative act of one of the parties.

In the instant case the plant was shut down for repairs on December 4th. Whether the employer-employee relationship existing between the Granite Company and the deceased was terminated at that time cannot be determined from the record. There is no evidence in the record which is specifically addressed to that question. If the relationship did continue, that is, if it was not terminated, if the employer did not notify the employee that his services would no longer be required, and if the employee had reason to believe that his employment would be resumed with the resumption of work in the plant, then the award of compensation was properly

made. The defendant sought to bring to the attention of the trial court the fact that this question was not tried before the Industrial Commission, and sought to obtain from the trial court, upon affidavits disclosing an understanding between employer and employee that he should return to work when repairs at the plant were completed, an order to show cause with a view of securing a modification of the judgment, resubmitting the matter to the Industrial Commission for the purpose of taking further evidence upon this question. The trial court refused to grant the order to show cause. The papers connected with such application, and the affidavits filed in support thereof, have been returned as a part of the record in this case, and appear in the printed case. A motion was made to strike these papers from the record in this court, which was taken under advisement with a view of disposing of the motion with the principal case. It appears that those papers were no part of the record which should have been returned to this court, and the motion to strike them from the record is now granted. It is not because of our perusal of these affidavits, but because the record made before the Industrial Commission discloses that this all-important question was not litigated before the Industrial Commission, that we arrive at the conclusion that the judgment of the circuit court should be reversed, and the cause remanded with instructions to remand the case to the Industrial Commission for further proceedings in accordance with this opinion.

*By the Court.*—So ordered.

A motion for a rehearing was denied, with $25 costs, on June 20, 1932.