MONTELLO GRANITE COMPANY, Appellant, vs. INDUSTRIAL COMMISSION and others, Respondents.   [Two cases.]

*February 18—March 15, 1938.*

The cause was submitted for the appellant on the brief of *Vincent McNamara* of Montello and *Goggins, Brazeau & Graves* of Wisconsin Rapids, and for the respondent Industrial Commission on that of the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and for the respondents Robert Zellmer and Joseph Heller on that of *Bogue, Sanderson & Kammholz* and *Grady, Farnsworth & Walker,* all of Portage.

The following opinion was filed March 15, 1938:

NELSON, J. The plaintiff considers itself aggrieved by the judgments of the circuit court which confirmed the orders of the commission which awarded compensation to the applicants, Heller and Zellmer, because a contractual arrangement existed between the plaintiff and a partnership known as "Granite Mens Company," of which Heller and Zellmer were members, which exempted the plaintiff from the provisions of the compensation act, and because, in any event, no compensable disability was shown to have been sustained by either Heller or Zellmer.

The examiner in substance found: That for many years prior to the end of December, 1932, the plaintiff had operated its granite quarry and plant at Montello and had been an employer of labor; that during most of the time since the compensation act was enacted the plaintiff was subject to its provisions; that commencing July 1, 1926, and ending May 8, 1931, the plaintiff, as an employer, was not subject to the act (*Montello Granite Co. v. Industrial Comm.* 212 Wis. 243, 248 N. W. 427, 249 N. W. 516); that at the end of December, 1932, the plaintiff shut down its plant because the cost of operating it had become unprofitable; that for many years prior to the end of December, 1932, the applicant, Heller, had been an employee of the plaintiff, and had been subject to the provisions of the act whenever the plaintiff was subject to it; that he had worked for the plaintiff approximately forty-two years in connection with polishing granite; that during practically all of that time he had been exposed to the inhalation of dust containing silica; that as a result he became afflicted with silicosis, and that that disease is now in its "third stage;" that his last day of work for the plaintiff was September 6, 1935; that he sustained no disability causing a wage loss or time loss prior to the last day he worked for the plaintiff; that since said September 6, 1935, he has been permanently partially disabled because of said silicosis to the extent of two thirds of total disability, and is entitled to compensation on that basis since September 6, 1935.

The examiner further found as to the applicant, Zellmer, that at the time of the hearing, he was forty-six years of age; that for twenty-one years he had worked as a stone-cutter for the plaintiff, in which employment he had been exposed to the inhalation of dust containing silica, and was suffering from silicosis which was in its "third stage;" that

September 13, 1935, was the last day he worked for the plaintiff; that he sustained no disability causing a wage loss or time loss prior to the last day he worked for the plaintiff; that since September 13, 1935, he has been permanently partially disabled because of said disease to the extent of two thirds of total disability; and that he is entitled to compensation on that basis since September 13, 1935.

The plaintiff contends that the findings that Heller's last day of work for the plaintiff was September 6, 1935, and that Zellmer's last day of work for the plaintiff was September 13, 1935, are not supported by the evidence, because at those times both applicants were performing work for Granite Mens Company, a partnership, of which the applicants were members, and that the partnership was an independent contractor. With respect to that contention or issue, the examiner, in substance, found: That in the spring of 1933, some time prior to June 24, 1933, there were negotiations concerning the reopening of the plaintiff's plant, which had been shut down since December, 1932, and discussions as to how it might be reopened and successfully operated; that the matter was discussed by the plaintiff's president and general manager with representatives of the plaintiff's former employees who had been out of work since the plant was shut down; that both the plaintiff and such of its former employees as were to have an opportunity to work in the plant in case it was reopened, were desirous of having the plant operate again; that the plaintiff desired that the plant be reopened both for the purpose of making a profit and for the purpose of furnishing work to its former employees; that in the course of such negotiations and conferences a Montello attorney was requested to draw up a partnership agreement, to be entered into by the employees, and a lease of the plaintiff's plant to the partnership; that such partnership agreement and lease were drawn up after discussing the matter

with the plaintiff and with representatives of plaintiff's former employees; that the partnership agreement and the lease were explained to all of the parties concerned before it was signed; that the attorney who drew up the agreement was the attorney of the employees; that the partnership agreement was signed by fifty-one of the plaintiff's former employees; that the lease was signed by the plaintiff's officers and by certain former employees, who had been authorized so to do, by all of the others who had signed the partnership agreement; that both the partnership agreement and the lease were renewed every three months until August, 1935; that the wording of the partnership agreement and the lease and the renewals thereof indicate an intention to create a partnership; that there was no fraud in connection with the making of the partnership agreement or lease; that considering only the partnership agreement and lease, a partnership would appear to have been created and a relationship of lessor and lessee established between the plaintiff and its former employees who had signed the partnership agreement; that on or about June 28, 1933, the applicants and other former employees went back to work at the plaintiff's plant doing work similar to that which they had previously done; that on September 2, 1933, after having been at work from about June 28, 1933, the applicants and other employees who had gone back to work, executed on September 2, 1933, a "notice of nonelection of copartner or official of corporation" addressed to the plaintiff and delivered it to the plaintiff, which read as follows:

"You will take notice that we, your employees, elect not to be subject to the provisions of the workmen's compensation act of Wisconsin while in your employ until further written notice;"—

that said notice was filed with the commission on September 5, 1933; that by legislative enactment effective July 14,

1933, ch. 402, Laws of 1933, the law which defined partners to be employees was repealed; that said notice was ineffective if the applicant and the others who signed the same were employees because of an act of the legislature effective May 7, 1931, ch. 87, Laws of 1931, which required that all employers employing three or more employees should be subject to the provisions of the compensation act, and that their employees should be subject to it; that the applicants' work and that of the other employees who signed the original partnership agreement was the same sort of work that they had previously done as employees of the plaintiff; that they were under the same sort of supervision as before; that the applicants were paid by the hour as provided by the partnership agreement; that their earnings or income from their work were dependent upon the number of hours that they worked; that the amount of the product which could be disposed of by the plaintiff determined the number of hours that the former employees could work; that at times there was not enough work for the applicants and all the other employees, and the work at such times was staggered so as to give some work and some income to all of them; that the applicants and other former employees had no right to work as many hours as they desired; that the Granite Mens Company had no right to sell any product to anyone except to the plaintiff; that the finished products of the applicants and other former employees under the partnership agreement were the property of the plaintiff to sell or to do with as it desired; that the only benefits derived by the applicants, and the other former employees who were members of the Granite Mens Company, were the wages received by them which were fixed by the partnership agreement; that in doing the work after the agreement of partnership was entered into, the applicants and other former employees were subject to the directions of foremen who had been foremen in the plant prior to the signing of the partnership agreement; that shortly after the

original partnership agreement and the lease were entered into the applicants and other former employees, who had signed the partnership agreement, went back to work at plaintiff's plant; that five other men were called to work at the plant by the plaintiff's superintendent, who, after they had worked a short time, signed the partnership agreement; that an account of the earnings of the applicants and the other former employees and the other workers of the partnership was kept in the office of the plaintiff, by employees of the plaintiff, and the earnings of the applicants and each of the other members were kept separately in the books of the plaintiff; that the plaintiff was paid nothing by the partnership for keeping the account; that said books of account of said earnings were kept under the supervision of the plaintiff's bookkeeper who was not a member of the Granite Mens Company; that the applicants and other former employees did not know what rights, if any, they had relative to discharging or temporarily laying off any member of the partnership for failing to work properly or for intemperance; that on one occasion when representatives of the partnership went to the plaintiff's manager to find out what could be done with reference to such an employee, the manager informed them that the partnership could do what it wanted to do; that the relationship between the plaintiff and the applicants and the other former employees, after returning to work at the plaintiff's plant, subsequent to the signing of the partnership agreement, was the same as it previously had been; that the applicants and the other former employees were at all times subsequent to their return to work employees of the plaintiff, and the plaintiff had the same right of control over them that it had previously had. The findings of the examiner were approved by the commission.

None of the findings is assailed by the plaintiff, except the mixed finding of fact and conclusion of law that the relationship between the plaintiff and the applicants, subsequent to

the signing of the partnership agreement and the lease, was that of employer and employee.

The plaintiff earnestly contends that a valid *bona fide* partnership between the applicants and the other former employees resulted, and that such partnership, in entering into the lease and in performing the work of quarrying granite, and working it into finished products, was acting as an independent contractor. So the important questions are: (1) Do the facts found impel the conclusion that a partnership between the applicants and the other former employees resulted? (2) Do the facts impel the conclusion that the group of fifty-one men was an independent contractor? It is our conclusion that both questions must be answered in the negative.

The partnership agreement concededly was entered into so that the plaintiff's former employees might work in the plaintiff's plant under conditions which would not subject the plaintiff to the burdens of the compensation act. The plant was closed down at the end of December, 1932, because it could not profitably be operated, owing to the prohibitive cost of compensation insurance. The members of the so-called partnership were willing to work under an arrangement which would permit them to work without being entitled to the benefits of the compensation act. Most of the members of the so-called partnership had worked many years for the plaintiff, were skilled in no other trade, and owned their own homes in Montello, where they and their families resided.

The partnership agreement was entered into by fifty-one of the plaintiff's former employees "for the purpose of carrying on the business of quarrying granite; to wit: All the processes from blasting out the granite to the finishing of the granite into monuments—the partnership shall also enter the business of selling monuments." It was to begin operation

on June 24, 1933, and continue for three months. Its capital was $51 contributed by the partners. That capital "together with all the income and profits arising from said business of the company, with the exception of what each partner is entitled to draw out," was "to become and constitute a permanent fund for partnership purposes." The agreement recited that "the fifty-one partners . . . are made up of experienced stonecutters, blacksmiths, surface machine operators, polishers, engine men, blasters and ordinary workmen—that the ability of the different classes of workmen shall make a difference in the division of the profits and losses." The agreement further provided that "each partner shall be entitled to draw out of the profits twice a month the following amounts per hour for each hour worked by said partner." Every partner was listed therein together with the amount "per hour" to which he would be entitled. The agreement further provided that "each partner shall continue to draw twice a month the amount per hour set after his name for the total number of hours worked by him during the period," and "each partner shall share in all the profits over and above his hourly basis in equal shares—on all profits made in selling monuments the partners shall all share equally," and that "the partners shall also share in all losses in equal amounts. The partnership shall lease quarry property, contract to quarry and finish granite, and to take all necessary steps to operate said partnership business in the village of Montello." The agreement further provided that "in the event that the partnership cannot contract for a large enough piece of business so as to keep all the partners busy from month to month," that a certain named committee should "stagger the work," that "the partners not working shall not receive a *pro rata* of profits on the hour basis during the time said partner or partners are not working—this, however, will not affect a division of any profits existing

over and above the hour basis." The agreement further provided that four members (to be named) might "allow additional members to join the partnership."

Sec. 123.03 (1), Stats. 1935, defined a partnership as "an association of two or more persons to carry on as co-owners a business for profit."

Sec. 123.04 (4), Stats. 1935, provided in part as follows:

"The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment . . . as wages of an employee. . . ."

What the parties to an agreement call themselves is not at all conclusive on the question of the existence of a partnership. See Mechem, Elements of Partnership (2d ed.), p. 66, § 73:

". . . What the parties have called themselves is not conclusive, for if they have stipulated for what is a partnership in fact, then even their express agreement that they should not be partners would not prevent the legal operation of their stipulations. If, on the other hand, their acts and contracts do not in law create a partnership, the fact that they have expressly called it such will not make it one."

See also *Spaulding v. Stubbings,* 86 Wis. 255, 262, 56 N. W. 469; *Sparks v. Kuss,* 195 Wis. 378, 216 N. W. 929, 218 N. W. 208.

In *Spaulding v. Stubbings, supra,* the following test for determining the existence of a partnership is laid down:

"The real inquiry always is, Have the parties by their contract combined their property, labor, or skill in an enterprise or business, as principals, for the purpose of joint profit?"

It has been uniformly held that profits in which a partner is to share must be real profits, not wages. Our statute, sec. 123.04 (4), *supra,* which is a section of the Uniform

Partnership Act, is a statutory recognition of the common law as it existed prior to the framing and adoption of that act. In *Wagner v. Buttles,* 151 Wis. 668, 675, 139 N. W. 425, it was said:

"Wherever it appears that one should share in the profits of an enterprise as compensation for the services, property, or opportunity furnished by him in aid of the business, no partnership results. He must share in profits as such and not as compensation for services or property, or the parties do not become partners. *Hoile v. York,* 27 Wis. 209; *Ford v. Smith,* 27 Wis. 261; *Nicholaus v. Thielges,* 50 Wis. 491, 7 N. W. 341; *Sohns v. Sloteman,* 85 Wis. 113, 55 N. W. 158. There are a multitude of decisions by other courts which hold that an agreement to contribute labor or property in consideration of receiving a part of the profits of some enterprise does not create a partnership where such profits are paid as compensation for the thing contributed. Reference is made to a few of them: [Citing cases]."

Both the common law and the statute run *contra* to the plaintiff's contention that under the undisputed facts and circumstances of this case a partnership resulted. The so-called partnership received from the plaintiff twice a month the exact amount which the members of the partnership had earned under the wage scale set forth in the agreement. Under the agreement as drawn, and under the practice pursued in carrying it out, the applicants and other signers could never receive anything more than the amounts specified in the wage scale, multiplied by the number of hours each member actually worked. The undisputed facts here do not warrant, much less impel, the conclusion that a partnership resulted.

Do the facts impel the conclusion that the signers of the partnership agreement, by entering into the lease, formed some sort of an association or entity which properly may be considered as an independent contractor? The lease en-

tered into between the plaintiff and the partnership was for a term ending August 1, 1935. The consideration was the "mutual covenants herein contained." The plaintiff leased to Granite Mens Company "its quarry, cutting plant, blacksmith shops, polishers, and all of its property, tools, and equipment with the exception of its office and power plant." The plaintiff agreed to furnish to the Granite Mens Company "all electrical energy and power necessary to operate said quarry and plant." The partnership covenanted to "quarry, produce, cut, polish and furnish monuments," to "operate said quarry and plant in an efficient and workmanlike manner," to "sell and dispose of its entire output" to the plaintiff, and the plaintiff covenanted and agreed that it would "accept and take delivery of the said entire output of the co-partnership," and would "at the end of each fifteen days pay or cause to be paid to the said copartnership the actual costs of the productions of such finished products and crushed stone." The lease further provided that "the actual costs thereof to be arrived at by the committee heretofore named and the representatives of said company at the expiration of each fifteen days." The lease further provided that "in the event said arrangement proves mutually satisfactory that a subsequent contract may be entered into upon a cost plus basis;" that the plaintiff should "have the right to inspect the operations of said copartnership at any of its stages," and should "have the further right to inspect its equipment at any and all reasonable times." The plaintiff further agreed "to replace any and all equipment which shall be damaged, defective or worn out," and "that if at the end of the term hereof there shall be material and stock not finished" that the plaintiff "shall compensate the said copartnership for the cost of the production thereof up to its then

stage." The lease contained other provisions which need not be recited, and concluded thus:

"It being expressly understood and agreed that the said Montello Granite Company assumes no responsibility or liability for injuries or diseases occurring to said copartners and the said copartnership will save the said Montello. Granite Company harmless from any and all liability arising by reason of claims of any sickness, injuries or deaths occurring to any of said partners."

The lease was renewed from time to time so long as the so-called partnership continued to operate the quarry. No contract was ever entered into under which the plant was to be operated by the partnership on a cost-plus basis.

It has been held over and over again, that, in determining the status of a person who seeks compensation, it is proper not only to consider all of the writings which attempt to define the status of the parties, but also all of the surrounding circumstances in order correctly to ascertain the exact relation which has resulted from the dealings between the parties. *Nestle's Food Co. v. Industrial Comm.* 205 Wis. 467, 237 N. W. 117; *Kneeland-McLurg Lumber Co. v. Industrial Comm.* 196 Wis. 402, 220 N. W. 199; *Heineman Lumber Co. v. Industrial Comm.* 226 Wis. 373, 276 N. W. 343.

When a person is injured while performing services for another, a presumption arises in favor of the injured person that he is an employee of the person for whom the service is being performed, and not an independent contractor. That rule casts the burden upon him who seeks to defeat compensation. *Habrich v. Industrial Comm.* 200 Wis. 248, 227 N. W. 877. See also *Allaby v. Industrial Comm.* 200 Wis. 611, 229 N. W. 193; *Connor L. & L. Co. v. Industrial*

*Comm.* 203 Wis. 85, 233 N. W. 559; *McKesson-Fuller-Morrisson Co. v. Industrial Comm.* 212 Wis. 507, 250 N. W. 396; *Eagle v. Industrial Comm.* 221 Wis. 166, 266 N. W. 274; *Tiffany v. Industrial Comm.* 225 Wis. 187, 273 N. W. 519.

In determining whether one is an employee or an independent contractor, it has consistently been held that the most significant *indicium* of an independent contractor is his right to control the details of the work, and that the principal test to be applied in determining whether one rendering services for another is an employee or an independent contractor is whether the employer has the right to control the details of the work. This is the dominant test, although there are other things to be considered, such as the place of the work, the time of the employment, the method of payment, and the right of a summary discharge of employees. *Habrich v. Industrial Comm., supra; Kolman v. Industrial Comm.* 219 Wis. 139, 262 N. W. 622. It is very clear from the testimony and findings that the so-called partnership did no work except that which was given to it by the plaintiff; that when no work was given to it by the plaintiff the men laid off; that all of the work was done in the plaintiff's quarry; that the plant to all intents and purposes was operated exactly as it had been operated before it was closed down at the end of December, 1932; that although the men were not paid directly by the plaintiff, they were paid by the checks of the so-called partnership immediately after it had received the plaintiff's check; that the amount received by each member was only the amount which he had earned, based on the wage scale incorporated into the partnership agreement, multiplied by the exact number of hours which he had worked; and that the sum of the checks issued to the members exactly equaled the amount of the check issued to the partnership by the plaintiff. The plaintiff's checks which

were issued semimonthly to the partnership were always based upon the pay per hour which each member of the partnership was to receive, multiplied by the number of hours which each member had worked according to the time kept by the plaintiff. Much of the work was performed in compliance with certain drawings or specifications furnished by the plaintiff, and was subject to continuous inspection. Under all of these circumstances, we conclude that the conclusions of the examiner (which were approved by the commission), that the relationship between the plaintiff and the members of the partnership was that of employer and employee rather than that of employer and independent contractor, cannot be disturbed. The whole setup, considered in connection with the manner of operating the plant under it, was properly regarded as a device, scheme, or cover to circumvent the compensation act.

It is contended by the plaintiff that this controversy is ruled by *York v. Industrial Comm.* 223 Wis. 140, 269 N. W. 726. In that case the commission held that the relationship between York, the claimant, and Schlimgen Memorials, Inc., was that of employer and independent contractor, rather than that of employer and employee, which conclusion was set aside by the circuit court upon review, but affirmed by this court upon appeal. A consideration of the facts in the *York Case,* with the facts in this case, reveal so many obvious differences as clearly to distinguish that case from this.

The plaintiff further contends that regardless of whether the relationship between the plaintiff and the applicants was that of employer and employees, the trial court erred in confirming the awards, because neither of the applicants sustained a wage loss, and therefore no compensable disability was proven. The contention is based upon the facts that neither applicant suffered a wage loss before he was discharged. The case principally relied upon by the plaintiff is

*Milwaukee M. & G. I. Works v. Industrial Comm.* 220 Wis. 244, 247, 263 N. W. 662, 265 N. W. 394. There is, in that opinion, language which tends to support the plaintiff's contention if it be considered apart from the facts of that case. It was there said:

"The fact that he [the applicant] thereafter, at a time when he was not employed, suffered from a complication of diseases which incapacitated him from further labor of any kind does not establish disability as it had been defined."

The court referred to the rule that there could be no disability in an occupational-disease case in the absence of a showing of a wage loss. *Wisconsin Granite Co. v. Industrial Comm.* 208 Wis. 270, 242 N. W. 191; *Michigan Quartz Silica Co. v. Industrial Comm.* 214 Wis. 289, 252 N. W. 682; *North End Foundry Co. v. Industrial Comm.* 217 Wis. 363, 258 N. W. 439; *Motor Castings Co. v. Industrial Comm.* 219 Wis. 204, 262 N. W. 577. On motion for hearing we were requested to make a definite pronouncement on the question whether, under the 1933 amendment (ch. 314, Laws of 1933), compensation is payable when disability first occurs after the termination of the employer-employee relationship. We were further urged to hold that the effect of the 1933 amendment was to bring within the act, the so-called presumed wage-loss doctrine, in cases where workmen become disabled after the termination of the employer-employee relationship. Since all parties conceded, as stated in the *per curiam* decision, that the decision was correct, and since the same question was to be raised in *Schaefer & Co. v. Industrial Comm.* 220 Wis. 289, 291, 295, 296, 265 N. W. 390, which was then pending in this court, the court was of the view that the matter of clarification might be more properly dealt with in the *Schaefer Case.* In the *Schaefer Case,* the court sought to clarify the

meaning of so much of sec. 102.01 (2), Stats. (1933 amendment), as reads as follows:

" 'Time of injury,' 'occurrence of injury,' 'date of injury' is the date of the accident which caused the injury or in the case of disease, the last day of work for the last employer whose employment caused disability."

The court said:

"This court has consistently held under the Workmen's Compensation Act that in cases of occupational disease, in order to entitle an employee to compensation, he must have sustained such physical incapacity from disease as renders him incapable of performing his services to the extent that a wage loss results while the employer-employee relationship exists between the parties." '

It was argued by the assistant attorney general on behalf of the Industrial Commission that in the *Wisconsin Granite Co. Case, supra,* and *Michigan Quartz Silica Co. v. Industrial Comm., supra,* awards had been sustained which had been made upon a presumption of wage loss under the facts of those cases. The court, after discussing numerous prior cases, stated: .

"However, in order to sustain an award, there must be disability which means such a physical incapacity to work as results in a wage loss. Therefore, as already pointed out, the question comes down to what constitutes a wage loss. In a case where a man is dead and left his work because of the occupational disease which caused his death, there can be no doubt that a wage loss was sustained."

After discussing the medical testimony adduced, the court said:

"When we consider that in this case it is agreed that the applicant is suffering from silicosis, that as a result of it he is incapable of more than slight physical exertion, that by reason of his physical incapacity due to silicosis he can be employed only in occupations which involve so-called light

work, we cannot say that there is no evidence which sustains the finding of the commission that he has sustained a wage loss, which, measured by the rate of compensation he had theretofore received, amounts to fifty per cent."

It is clear that, in the *Schaefer Case,* an award was approved which granted compensation to an employee who was afflicted with silicosis, who had been discharged, and who had not succeeded in obtaining other work. The language that "in order to sustain an award, there must be disability which means such a physical incapacity to work as results in a wage loss," does not mean that an employee who is suffering from an occupational disease and who has been discharged by his employer because of such complication is not entitled to compensation unless he first obtains other work and attempts to perform it, in order to demonstrate his actual physical incapacity. Actual physical incapacity to work as of a certain date may be proven to the satisfaction of the commission by the testimony of the applicant, and by credible medical testimony which clearly differentiates between medical or pathological disability which has resulted in no wage loss and actual disability, *i. e.,* physical incapacity to work. This meaning, it is considered, is in accord with the intention of the legislature. To hold otherwise would deny compensation to an employee who had been discharged because of an occupational pathological disability, and who at that time had sustained no actual wage loss, but who, because of that disease, had subsequently found it impossible to obtain or to perform other work, and who had even found it necessary to take to his invalid chair or bed. To so hold, would, in our opinion, unduly restrict what the legislature sought to accomplish by the 1933 amendment.

When disability, *i. e.,* actual physical incapacity to work at all, or actual physical incapacity to work more than a part of the time, occurs as a result of an occupational disease, after the relation of employer and employee has ended, the 1933

amendment decrees that such disability shall be compensated by the last employer whose employment caused disability. "Employment caused disability" means that employment which caused it or to some appreciable extent furthered its progress. This construction given to the 1933 amendment imposes upon the trier of the facts, in cases involving claims of disability made after the relation of employer and employee has ceased, a much greater responsibility than that which inheres in the determination of ordinary claims arising out of accidental injuries. *Schaefer & Co. v. Industrial Comm., supra.* However, it is a responsibility which can be met and in which sound and impartial conclusions can be reached, upon which just awards may be based.

In the present cases, the evidence is amply sufficient to support the findings that both applicants were suffering from silicosis; that both applicants acquired the disease while employed by the plaintiff; that the disease from which each applicant suffers has progressed to its so-called "third stage;" that no recovery is possible; and that the disease will very likely progress and become worse.

The commission awarded compensation to the applicants commencing from the very days they were in fact last employed by the plaintiff. Although Dr. Henny, who examined the applicant, Heller, on December 12, 1935, and January 28, 1936, testified at the hearing which occurred in 1936, that Heller had been totally disabled for at least a year before that time, the doctor obviously was speaking of Heller's medical or pathological disability, because concededly Heller had worked up to September 6, 1935, without loss of wages. The same conclusion must be reached with respect to Dr. Henny's testimony regarding Zellmer's disability, whose last day of work was September 13, 1935. The evidence, however, is sufficient to support a finding that Heller was disabled to the extent of two thirds of total disability, on December 12, 1935, when Dr. Henny examined him, and

that Zellmer was disabled to the extent of two thirds of total disability on January 10, 1936, when Dr. Henny examined him.

Under the 1933 amendment, disability, *i. e.,* actual physical incapacity to work at all or such actual physical incapacity to work more than part time, may be referred back to the last day of work for the last employer whose employment caused it, as the date of injury, but the amendment does not, in our opinion, contemplate that compensation as a matter of course shall be paid from such last date of work.

*By the Court.*—The judgment and award in the Joseph Heller case is modified so that compensation shall commence as of December 12, 1935.

The judgment and award in the Robert Zellmer Case is modified so that compensation shall commence as of January 10, 1936.

As so modified, both judgments are affirmed.

Motion for modification of mandate denied, without costs, on April 12, 1938.