EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY and another, Appellants, vs. INDUSTRIAL COMMISSION and another, Respondents.

*February 10—March 7, 1939.*

For the appellants there was a brief by *Richmond, Jackman, Wilkie & Toebaas* of Madison, and oral argument by *W. L. Jackman.*

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

NELSON, J.   The defendant, John A. Laufenberg, hereinafter called the "applicant," sustained certain personal injuries as a result of his automobile leaving the highway and overturning in the ditch while he was proceeding from Madison to Middleton at a late hour on November 27th or an early hour on November 28, 1936.   At the time of the accident, he was the manager of the plaintiff, Middleton Farmers Co-Operative Oil Company, hereinafter called the "company," which was engaged in the business of selling gasoline, kerosene, oil, grease, feed, hay, and farm seeds.   In April, 1933, the applicant entered into a contract with the company under the terms of which the applicant was to act as manager

of its bulk plant and retail stations for the term of three years. In the contract the company was referred to as the employer and the applicant as manager. The contract provided:

"2. Manager shall sell and deliver the gasoline, kerosene, lubricating oils, greases and burning oils from said bulk plant and retail stations of employer.

"3. Manager shall supervise, operate and maintain to the best of his ability said bulk plant and retail stations.

"4. Manager shall devote the whole of his time, attention and energy to the performance of his duties as manager and shall not either directly or indirectly, alone or in partnership, be connected with or concerned in any other gasoline business or pursuit whatsoever during the term of this business.

"5. Employer agrees to pay manager as compensation for his said services, as follows:

"a. 2¢ per gallon on all gasoline and kerosene sold.

"b. 6¢ per gallon on all lubricating oils sold.

"c. 1⅓¢ per gallon on all burning oils sold.

"d. 12% of selling price on all grease sold.

"6. Manager shall furnish a surety bond in the amount of $1,000 and the employer shall pay the premium thereon.

"7. Manager shall furnish all necessary help in the maintenance and operation of said bulk plant and retail stations and shall pay their wages, excepting a bookkeeper which employer shall pay for.

"8. The parties hereto shall have an accounting at the end of each month, at which time manager shall receive his compensation for his said services.

"9. Employer agrees to furnish manager with the gasoline, oil and grease for use in trucks and cars used in the operation and conduct of said business."

The contract expired by its terms on April 3, 1936, but the parties continued to operate under it up to the time of the accident and thereafter. In practice, the compensation paid to the applicant was computed as follows: The commissions on all sales were totaled each month by the company from which were deducted all wages paid to the drivers of the oil trucks. The remainder was paid to the applicant. The company also sold feed and seed but the applicant received no compensa-

tion based on these sales. An employee known as "the bulk man" handled the feed and seed business under the management of the applicant. His wages, as well as the wages of the company's bookkeeper, were paid by the company. Three oil trucks were employed in the company's business. One of these was owned by the applicant and two by their respective drivers. The trucks used in the feed and seed business were owned by the company. The truck drivers were recommended by the applicant to the board of directors who accepted them. The company furnished gas and oil for the several trucks and also for the applicant's automobile. Credit was, from time to time, extended to some of the company's patrons. Such credit as was extended was at the company's risk. The company was officered by a president and secretary and a board of directors. The president resided in Madison and occasionally went to Middleton to attend to the company's business. He was paid a salary of $300 a year. From time to time the president gave attention to the matter of credit extended and personally assisted in making collections. He and the manager would, from time to time, call upon customers to whom credit had been extended for the purpose of making collections. In doing such work it was considered that better results could be accomplished by calling on the farmers late in the afternoon or in the evening when they would likely be found at home. Such a trip was undertaken on November 27, 1936, by the president and the manager. They left the company's office at about 4 o'clock in the afternoon and called upon a number of customers. They stopped at a tavern in Lodi for supper and then proceeded to call on several customers during the evening. They ended up the collection work in the vicinity of Roxbury and then started to return toward Middleton. When they arrived at Pheasant Branch, which is about a mile from Middleton, the applicant, without anything being said by either him or the president,

drove toward Madison around the north and east sides of Lake Mendota, for the purpose of taking a short cut to the president's home. The applicant testified that he took the president home because the latter "kind of expected it." The president testified that he expected the applicant to take him home that night because the applicant had done it as a favor lots of times. No bus or train from Middleton to Madison was running at that time of night. During the trip to Madison, as well as during about a half hour after arriving at the president's home, the applicant and the president continued to talk over matters relating to the company's business. The applicant finally left the president's home, drove through Madison and proceeded on Highway No. 12 toward Middleton. His overturned car was discovered at the roadside by a passing motorist somewhere about 3 o'clock in the morning. The applicant was extricated from the wreck and taken to the Wisconsin General Hospital. Other facts will be stated in discussing the several contentions of the plaintiffs.

The commission concluded: That at the time of the applicant's injury, he was an employee of the company under a contract of hire; that in taking the president to his home on the evening in question he was performing service growing out of and incidental to his employment; that at the time of his injury, he was likewise performing service growing out of and incidental to his employment; that as a result of his injuries, he had sustained a wage loss of twenty per cent for twenty-one and two-thirds weeks, and was entitled to compensation amounting to $91; that the applicant had incurred a charge of $93.50 for treatment rendered him by the Wisconsin General Hospital, and a charge of $5 for treatment rendered him by Dr. Dimond. The interlocutory award required the company and its insurance carrier, within ten days, to pay to the applicant the sum of $91, to the Wisconsin General Hospital $93.50, and to Dr. Dimond $5.

.The plaintiffs contend: (1) That no credible evidence was adduced to support the finding that the applicant was an employee of the company; (2) that no credible evidence was adduced to support the finding that the applicant, at the time of his injury, was performing service growing out of and incidental to his employment, and (3) that no credible evidence was adduced to sustain the finding that the applicant suffered a wage loss of twenty per cent for a period of twenty-one and two-thirds weeks.

The plaintiffs contend that the evidence impels the conclusion that the relationship between the applicant and the company was that of employer and independent contractor rather than that of employer and employee, as found by the commission. We have repeatedly held that the principal test for determining whether one performing service for another is an employee or an independent contractor is the right to control the details of the work. In the recent case of *Montello Granite Co. v. Industrial Comm.* 227 Wis. 170, 184, 278 N. W. 391, it was said:

"In determining whether one is an employee or an independent contractor, it has consistently been held that the most significant *indicium* of an independent contractor is his right to control the details of the work, and that the principal test to be applied in determining whether one rendering services for another is an employee or an independent contractor is whether the employer has the right to control the details of the work." See also *Badger Furniture Co. v. Industrial Comm.* 200 Wis. 127, 129, 130, 227 N. W. 288; *Kolman v. Industrial Comm.* 219 Wis. 139, 141, 262 N. W. 622; *Eagle v. Industrial Comm.* 221 Wis. 166, 169, 266 N. W. 274.

It is quite immaterial whether the right to control is exercised by the master so long as he has the right to exercise such control. *Ronning v. Industrial Comm.* 185 Wis. 384, 200 N. W. 652; *C. R. Meyer & Sons Co. v. Grady,* 194 Wis. 615, 217 N. W. 408; *Habrich v. Industrial Comm.* 200 Wis. 248, 227 N. W. 877; *Allaby v. Industrial Comm.* 200

Wis. 611, 229 N. W. 193. See also *Gomber v. Industrial Comm.* 219 Wis. 91, 261 N. W. 409; *Tiffany v. Industrial Comm.* 225 Wis. 187, 273 N. W. 519.

The applicant, obviously, was employed as a manager. Managers ordinarily are employees with large powers and discretion in conducting a business, but subject to the right of control by the board of directors. There is abundant testimony in this case to permit the inference that the applicant worked under the board of directors; that the board of directors had the right to hire and fire employees, and that the applicant himself was subject to instructions and directions given him by the board of directors. No useful purpose would be served by reciting specific facts. The contract itself contains no suggestion that the applicant was an independent contractor, or that the directors had no powers except to approve or disapprove of the final results sought to be attained. We think it clear that the finding and conclusion of the commission that the applicant was an employee may not be disturbed.

The plaintiffs next contend that the evidence does not sustain the finding or conclusion that the applicant was performing service growing out of and incidental to his employment at the time he was injured. It is argued that there can be no liability to an employee who is injured while transporting other employees unless such transportation is pursuant to an agreement of the employer to transport such employees, and that when such transportation arises out of the doing of a mere courtesy or favor by one employee to another, there being no obligation or duty on the part of the employer to furnish such transportation, no liability to compensate exists. Such is substantially the rule. See *Western Fruit Co. v. Industrial Comm.* 206 Wis. 125, 238 N. W. 854; *Olson Rug Co. v. Industrial Comm.* 215 Wis. 344, 254 N. W. 519. In the *Western Fruit Co. Case,* the president of the company, at the time of his injury, was simply engaged in performing

a courtesy to other employees of the company in permitting them to ride with him in his automobile toward their homes at the close of the day's work. There was no duty on the part of the company to transport the employees from its place of business to their homes. In the *Olson Rug Co. Case,* an employee was injured while returning from a trip which he had undertaken for the purpose of taking another employee, who was seriously ill, from his boarding place in Milwaukee to his home in Oconomowoc. It was there held that there was no liability on the part of the company because there was no duty on its part to transport the employee who was ill to his own home. The facts of those cases are quite different from the facts here, and those cases, in our opinion, do not rule the present controversy. It is not disputed that commencing at about 4 o'clock in the afternoon on November 27th, the president of the company, who resided in Madison, and the applicant left Middleton for the purpose of making collections for the company. Such business necessitated transportation from farm to farm and from station to station. The work was undertaken during the late afternoon and evening because at that time of day, in the judgment of both the president and the applicant, the debtors more likely could be contacted at their homes. The president, although working for a small salary, apparently functioned as the president of the company. He watched the matter of credits and, from time to time, gave attention to collections. While there was no express contract between the company and the applicant requiring the latter to transport the president to his home after collection trips were concluded, that had been the custom and the applicant knew that the president expected him to take him to his home in Madison at the conclusion of the work and the president expected to be so transported. Certainly, the expectation of the president, based on a practice which had existed for some time is

sufficient to permit of the inference that the company knew of such practice, acquiesced therein, and likewise expected the applicant to transport the president to his home on such occasions, since there was no bus or train available for such transportation at that time of night.

In *Severson v. Industrial Comm.* 221 Wis. 169, 175, 266 N. W. 235, an award to the widow of a truck driver, who was killed while helping another driver, was upheld. The deceased was not required to perform that service but it was customary for the drivers to help each other. The employer testified that he did not encourage such practice but knew that the drivers were doing it. It was there said:

"The Workmen's Compensation Act must be liberally construed in favor of including all service that can in any sense be said to reasonably come within it. *Brienen v. Wisconsin Public Service Co.* 166 Wis. 24, 163 N. W. 182. On the facts in this case, it would be a very narrow interpretation of the Workmen's Compensation Act to hold that the deceased, who at the time when injured was performing a duty that he was expected to perform, was not acting within the scope of his employment."

We conclude that under the facts of this case the commission was permitted to infer and to conclude that the applicant was performing service growing out of and incidental to his employment when he transported the president to his home on the evening of November 27th preceding the accident.

Argument is made by the plaintiffs that after the applicant left the president at his home he did not proceed directly to Middleton. The evidence tends to show that the applicant left the president's home sometime between 11 and 12 o'clock, and that he was not discovered at the side of the Middleton road in his overturned automobile until about 3 o'clock in the morning. The applicant testified that he proceeded immediately on his trip to Middleton after leaving the president. There is no proof to the contrary. The fact that he

was not found alongside of the highway until about 3 o'clock in the morning would permit of an inference that he stopped somewhere before proceeding on his way. However, the accident happened while he was proceeding along the Madison-Middleton highway toward his home;—the most direct route from Madison to Middleton. Even though he may have stepped aside temporarily from the scope of his employment, he was at the time of his injury clearly back within it. See *Schmiedeke v. Four Wheel Drive Auto Co.* 192 Wis. 574, 213 N. W. 292; *Racine County v. Industrial Comm.* 210 Wis. 315, 246 N. W. 303; *Continental Baking Co. v. Industrial Comm.* 222 Wis. 432, 267 N. W. 540.

The plaintiffs finally contend that there is no evidence to sustain the finding that the plaintiff sustained a wage loss of twenty per cent for twenty-one and two-thirds weeks as a result of his injury. This contention gives rise to a question which heretofore has not been directly considered by this court in connection with facts at all analogous. The applicant was the manager of a going successful co-operative company which had been in existence for a considerable number of years. Considering the amount of business it was doing, the inference is permissible that it had many members and many patrons. The company apparently was well managed. During the ten days that the applicant was confined in the hospital, the business of the company continued and sales were made as usual. There is no testimony that the business of the company fell off or was in the slightest manner affected by the temporary absence of the manager. After returning from the hospital to Middleton he was in touch with the company's affairs and spent some time at the office of the company while he was still partially disabled. As he improved he spent more time there, and from the middle of January on seems to have given considerable time to his managerial duties. His compensation, based on sales less the regular deductions, continued. During the period of his disability his compensation amounted to $1,409.52, which

was $356.16 less than what he earned during the corresponding months of the preceding year. Basing its computation upon those figures, the commission concluded that the applicant had sustained a twenty per cent loss of wages and made its award accordingly.

The plaintiffs contend that the commission's conclusions are based upon speculation and conjecture and therefore should not be sustained. *Creamery Package Mfg. Co. v. Industrial Comm.* 211 Wis. 326, 248 N. W. 140, and cases cited therein. With that contention we agree. When an employee is injured and is wholly or partially disabled he ceases ordinarily to earn wages and as a result sustains a wage loss. Under such circumstances he is entitled to compensation. But if his employer continues to pay him his full wages he cannot collect compensation from him because he has in fact sustained no wage loss. He is, of course, entitled to compensation, but if he is paid full wages during the time of his disability he obviously has sustained no wage loss. Whether the employer carries his own compensation risk or has it carried by an insurance company, can be of no materiality. One who has sustained no wage loss cannot recover compensation based on a theoretical loss of wages. Compensation must bear some reasonable relation to the loss which an injured employee has sustained. *Struck & Irwin Fuel Co. v. Industrial Comm.* 222 Wis. 613, 269 N. W. 319. In *General A. F. & L. Assur. Corp. v. Industrial Comm.* 221 Wis. 544, 546, 266 N. W. 226, it was said:

"Recovery cannot, of course, be had for the amount of the wages paid by the employer for the lost time, but the recovery herein was limited to compensation for the permanent disability found."

These conclusions are supported by the provisions of sec. 102.43 (2), Stats. 1935, which provide:

"(2) If the injury causes partial disability, during the partial disability, such proportion of the weekly indemnity rate for total disability *as the actual wage loss* of the injured

employee bears to his average weekly wage at the time of his injury."

In explanation of the provisions of that statute, the commission said:

"In cases of partial disability, *occasioning a wage loss,* the employee is to receive such proportion of his full weekly indemnity rate as his wage loss bears to his average wage. For example: An employee earning $20 per week should receive a weekly indemnity of $14 for each week during which he was totally disabled. If, on return to work, he earns but $15 per week, his loss of wage would be $5 per week and his weekly indemnity one fourth of $14, or $3.50." Workmen's Compensation Act Pamphlet, 1935, footnote, p. 31.

That there is no basis for the finding of the commission that the applicant had sustained a twenty per cent wage loss as a result of his injury, and that such finding is nothing but conjecture and speculation, is clearly shown by the fact that during the months of August, September, October, and November, just prior to the applicant's injury, the compensation received by the applicant was $322.10 less than that earned by him during the four corresponding months of the year before. During the four months preceding the applicant's injury, although the applicant was uninjured and on the job, his compensation showed a falling off of nineteen and six-tenths per cent. The difference between twenty per cent and nineteen and six-tenths per cent is so slight as to give rise to no permissible inference that the company's business, as reflected in its sales upon which the applicant's wages were computed, was affected by the applicant's injuries. It appears that the falling off in business commenced in August, 1936, and continued throughout the period of applicant's disability. It is our conclusion that the applicant wholly failed to prove that he had sustained a wage loss as a result of his injuries."

He was, however, entitled to reasonable medical and hospital expenses. Sec. 102.42, Stats. 1935.

The interlocutory order deals only with: (1) Compensation for loss of wages; (2) hospital expenses incurred by him at Wisconsin General Hospital amounting to $93.50, which doubtless included services performed by the doctors there who treated him since he was a clinic case; and (3) services rendered by the eye specialist amounting to $5. The interlocutory order therefore leaves open for future determination the question of compensation for permanent partial injuries sustained by the applicant. Sec. 102.55 (5), Stats. 1935.

*By the Court.*—So much of the judgment as confirms the award of the commission as to the hospital and doctor bills is affirmed, and so much of the judgment as confirms the award of compensation based on a wage loss is reversed.