GEORGE F. POTARACKE, Executive Director Board on Aging and LongTerm Care
You have asked for my opinion as to the legality of certain contract provisions utilized by some Wisconsin nursing homes that require prospective residents to enter and remain on "private pay status" for a given period of time before applying for medical assistance benefits. You pose the question of "legality" in general terms, but specifically refer to section 1909 (d)(2) of the Social Security Act (42 U.S.C. § 1396h(d)(2) (1977)). Section 1909 (d)(2) criminalizes the solicitation of money from residents or their families above and beyond the rate paid by medical assistance as a precondition of admittance or as a requirement for continued stay.
In essence, the contract provisions in question require that the prospective resident waive the right to apply to the Wisconsin Medical Assistance Program (hereinafter Medicaid) for a period of time as a precondition to admittance. For the purposes of this discussion, it is understood that the duration of the contract provision is typically twelve to eighteen months, and that nursing homes charge a higher rate to residents not supported by Medicaid, known as private pay patients, than is collected from Medicaid for program beneficiaries. It is further assumed that the prospective residents forced to agree to such provisions are typically on private pay status at the time of signing, but would generally qualify for Medicaid benefits before expiration of the contract provision. Virtually all nursing homes require some type of contract or admissions agreement to be executed before admission, but only provisions that would force a waiver of the right to apply for Medicaid are challenged here.
I.
Since your request does not specify all of the relevant facts for any specific case, I cannot predict with certainty the result should a court be faced with the question presented. However, there is a *Page 15 
strong probability that these contract provisions are unlawful if they in any respect deter the prospective resident from applying for Medicaid benefits.
A. Federal Developments
The tracing of developments at the federal level makes clear that such contract provisions offend public policy as enunciated by Congress, the federal courts and federal administrative agencies. When the Medicaid program was first established, many states were unable to bear the entire cost of providing medical care to the needy, notwithstanding the states' receipt of federal funds. The charges imposed by the nursing homes were, therefore, met by a combination of government funds and forced payments from Medicaid residents, relatives or friends, called supplementation. Starting in 1965, the secretary of Health, Education and Welfare (hereinafter HEW) approved state Medicaid plans including supplementation, so long as the state could show that it had existing supplemental arrangements with nursing homes and that, in the absence of such arrangements, it would be unable to attract a sufficient number or nursing homes to the program. SeeResident v. Noot, 305 N.W.2d 311, 313 (Minn. 1981); Johnson'sProfessional Nursing Home v. Weinberger, 490 F.2d 841 (5th Cir. 1974).
A few years later Congress noted that it would be better for all concerned if the practice would be abolished and all states set reimbursement rates adequate to meet providers' costs. Congress did not impose the statutory prohibition at that time, but relied on HEW's assurance that the practice would be phased out after 1971. S. Rep. No. 744, 90th Cong., 1st Sess. 187-88, reprinted in 1967 U.S. Code Cong. and Ad. News 2834, 3026.
In 1969, HEW promulgated the first version of the anti-supplementation regulation, which included the phase out of supplementation in the nursing home field. 45 C.F.R. § 250.30 (a)(6) (1972). The provision presently appears at42 C.F.R. § 447.15 (1978) and specifies that, "A State plan must provide that the Medicaid agency must limit participation in the Medicaid Program to providers who accept, as payment in full, the amount paid by the agency." In Lawrie v. Department of Public Aid,72 Ill.2d 335, 381, N.E.2d 266 (1978), the court upheld the state's authority to require a payment in full agreement with the provider based upon 42 C.F.R. § 447.15, as required by the federal regulation in order to avoid jeopardizing *Page 16 
federal funding. The court also emphasized that the regulation's central concern was the prevention of charges to recipients and their families.
In 1977, the government accounting office recommended new federal legislation enabling criminal prosecution for the practice of supplementation. Report of the Comptroller General ofThe United States, No. HRD-77-90, May 26, 1977. The Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub.L. 95-142 § 4 (b), 91 Stat. 1181, codified at 42 U.S.C. § 1396h(d), state in part:
(d) Whoever knowingly and wilfully —
 (1) charges, for any service provided to a patient under a State plan approved under this subchapter, money or other consideration at a rate in excess of the rates established by the State, or
 (2) charges, solicits, accepts, or receives, in addition to any amount otherwise required to be paid under a State plan approved under this subchapter, any gift, money, donation, or other consideration (other than a charitable, religious, or philanthropic contribution from an organization or from a person unrelated to the patient) —
 (A) as a precondition of admitting a patient to a hospital, skilled nursing facility, or intermediate care facility,
 (B) as a requirement for the patient's continued stay in such a facility,
 when the cost of services provided therein to the patient is paid for (in whole or in part) under the State plan, shall be guilty of a felony and upon conviction thereof shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
The Department of Health, Education and Welfare has consistently interpreted section 1396h(d) as a legislative statement of public policy condemning supplementation under whatever guise it appears. For example, the Health Care Financing Administration Regional Office Manual, Part 6, Medicaid Guidelines, Transmittal No. 16 (May 21, 1979), provides in part as follows:
 Section 5350-A. Acceptance of State Payment as Payment in Full: Nursing Home Prepayments and Deposits. *Page 17 
 Question 1. Can a nursing home require a prepayment or deposit to be made by or on behalf of an individual already certified as Medicaid eligible?
 Answer: No. . . .
 Question 2: Would the same answer to question #1 apply if the beneficiary had not yet been authorized for nursing care or certified as to level of care?
 Answer: As a condition of participation, a state can legally require providers of nursing home care to refrain from requiring deposits for covered services from a potentially Medicaid-eligible person; however, in those cases where the facility has required a deposit, Section 1902 (a)(34) mandates retroactive coverage of recipients and would therefore require that such deposits be returned to the individual after his eligibility under the state plan is established.
On October 1, 1984, a hearing on "Discrimination Against the Poor and Disabled in Nursing Homes" was held before the Special Committee on Aging of the United States Senate. The hearing focused on attempts by nursing homes to force prospective residents, not yet Medicaid eligible, to retain their private pay status for a given period of time and pay a given sum of money regardless of when they actually could become Medicaid eligible. 98th Congress, Second Session S. HRG. 98-1091, p. 6, 8. Senator John Heinz, of Pennsylvania, Chairman of the Special Committee, stated:
 The intent of the Congress in assuring medicaid beneficiaries equal access to care is clear. Back in 1977, we enacted legislation to make it a felony to solicit or receive funds from a medicaid patient as a condition of entering or remaining in a nursing home . . . .
 But the committee's investigation into nursing home practices documents that nursing homes do demand cash payments before they will accept a medicaid patient. The family of the patient may be asked to sign a private pay contract, pledging to pay out-of-pocket for care already paid for by taxes and promised under Federal law . . . .
 A . . . reason for nursing home discrimination is avarice, greed. . . . [W]e . . . know that investment analysts are recommending *Page 18 
nursing home stocks because they promise as much as a 20- to 48-percent return on equity per year.
S. HRG. 98-1091, at p. 1-2. These contracts were typically signed by the resident's children or family members on the assumption that after spending down to the point of reaching Medicaid qualifications the resident would have no money to pay the contractual obligation. Thus the contracts were euphemistically called "sponsors" agreements." S. HRG. 98-1091, p. 11. Certain testimony indicated that such contract provisions impacted most on racial minorities and were, therefore, a form of de facto
racial discrimination. S. HRG. 98-1091, p. 202-6. The commission found that discrimination against Medicaid recipients as well as potential recipients was a major problem in twenty-one states, including Wisconsin. S. HRG. 98-1091, p. 67. Chairman Heinz concluded that the practice was a felony under the 1977 amendments. S. HRG. 98-1091, p. 63.
The foregoing authorities obviously do not constitute binding precedent or specifically hold that such contract provisions are per se "illegal" in a situation devoid of Medicaid implications. However, they do establish beyond any doubt that the provisions are contrary to public policy as enunciated at the federal level insofar as they are a guise for supplementation.
B. State Developments
The states of Maryland, New York, Virginia and Washington have condemned similar contract provisions. Virginia has prohibited nursing homes from requiring prior status as a private paying patient as a precondition for admission.[1] Washington has determined that requiring even prospective Medicaid recipients to pay private patient rates for a specified time period may be in violation of section 1396h(d)(2), and that the contract becomes void at the time Medicaid eligibility is achieved.[2]
The attorney general of the State of Maryland determined that such contract provisions are violative of various federal and state *Page 19 
statutes, including the nursing home resident's "bill of rights".[3] The attorney general opined that contracts requiring prospective Medicaid recipients to remain as private pay patients for at least one year before applying for medical assistance benefits violated 42 U.S.C. § 1396h(d)(2)(A) and became void upon conversion to Medicaid.
The only test to date of the attorney general's opinion of which I am aware has been in the state's administrative law forum. In Summit Nursing Home, et al. v. Medical Care Programs,Department of Health Mental Hygiene, Final Decision and Order, Case No. 82-MAP-7 et seq., at 14, the Maryland Department of Health and Mental Hygiene determined that a nursing home may contract with a person not certified for Medicaid benefits to pay the private rate if the agreement does not restrict the individual in any way from applying for Medicaid, that the right to apply for Medicaid cannot be waived, that attempts to enforce such agreements by Medicaid certified nursing homes are illegal, and that an agreement purporting to waive the right to apply for Medicaid for a specified period of time is void ab initio.
While this administrative law decision is obviously not controlling here, the reasoning therein is persuasive. The secretary held that 42 U.S.C. § 1396h(d) came into operation and made criminal any attempts to pursue the agreement once the person was certified as a Medicaid recipient. Summit Nursing Home
at 7-8. The secretary also determined that express and implied threats to discharge a person who converted to Medicaid before the lapse of time specified in the contracts and defaulted on the payments were illegal and unenforceable. Summit Nursing Home at 9. Medicaid nursing home providers are required to meet certain standards listed in 42 C.F.R. § 442.202. This section incorporates the Patient's Bill of Rights contained in 42 C.F.R. § 405.1121 (k). The Patient's Bill of Rights provides that a patient may be transferred or discharged only for medical reasons, for his welfare or that of other patients, or for nonpayment. The opinion specifically stated:
 [R]eliance by an individual on Medical Assistance reimbursement as his/her source of payment for nursing home care cannot be considered as nonpayment . . . . *Page 20 
 The provisions of the "Patients' Bill of Rights" are not waiveable by individual patients. They are absolute legal obligations owed to the State and Federal Governments as conditions for the facilities continued participation in the Medicaid Program.
Summit Nursing Home at 10 (citations omitted, emphasis supplied in original).
The secretary further determined that under these circumstances the continued use of such clauses in any contract was deceptive and misleading, and in violation of the state's Consumer Protection Act, prohibiting any "misleading oral or written statement . . . which has the capacity, tendency, or effect or deceiving or misleading consumers . . . [or at failure to state a material fact if the failure deceives or tends to deceive."Summit Nursing Home at 11 (citation omitted). The secretary noted that the only purpose for including such an unenforceable clause in a contract was to induce the patients to believe that they were prevented from enjoying their rights to medical assistance.Summit Nursing Home at 11.
The opinion goes on to state that such agreements further violate the Patient's Bill of Rights because it requires that each patient be "fully informed before or at the time of admission, of his rights and responsibilities and of all rules governing resident conduct . . . ." 42 C.F.R. § 442.311. The secretary concluded that "because they are unenforceable and therefore misleading they are also void as against public policy." Summit Nursing Home at 11-12 (footnote and citation omitted). One pivotal fact in this portion of the holding was that patients entering nursing homes and their families are rarely in a position to bargain with the home about such clauses and are unlikely to know that they are unenforceable. SummitNursing Home at 12.
Glengariff Corp. v. Snook, et al., Medicare and Medicaid Guide (CCH), para. 33,605 at 9905 (N.Y.S.Ct., Nassau County, 1984), is the only known court case directly on point. The court concluded that an admission contract forcing a prospective nursing home resident to forego the right to apply for medical assistance for eighteen months was void as against public policy. In discussing42 C.F.R. § 447.15, which provides that providers must accept Medicaid payments as payment in full, the court stated:
 The fact that there is a statute or regulation in conflict with the terms of a contract does not necessarily render the contract void *Page 21 
automatically, for a party may waive a rule of law or a statute or even a constitutional provision enacted for his or her benefit or protection, so long as only a private right is involved. . . . The same rule does not apply when the right or benefit waived is based upon public policy considerations which negatively affect the public interest. Such rights may not be waived.
Medicare and Medicaid Guide at 9907 (citations omitted).
 In determining public policy, the Court may look to subsequently enacted legislation . . . . Therefore, Public Health Law § 2805-f(4) discussed supra, . . . is relevant in that respect. Both that statute and its federal counterpart predecessor [42 U.S.C. § 1396h] make it a criminal act to charge more than is received from Medicaid. . . . This reflects the legislative conclusion that the act is a heinous one, and both the federal and state legislation manifest that public policy is involved.
Medicare and Medicaid Guide at 9908. The court noted that its conclusion was supported by federal legislative history, and added:
 There is also the concern that if the clause in the contract be deemed an effective waiver, such "waivers" will rapidly find their way into all nursing home contracts, thereby rendering the public's protection of Medicaid recipients and their families totally ineffective. . . .
 Plaintiff's apparent intent of denying a poor person the right to make application for assistance which the state and federal government have seen fit to provide cannot be condoned legally or morally.
Medicare and Medicaid Guide at 9908 (citation omitted).
The holding of the New York trial court has been implemented on a statewide basis, as evidenced by a State of New York Department of Health Memorandum, Series 84-54, dated June 13, 1984:
 Clauses in admissions agreements which constitute "waivers" . . . of the right of a patient to apply for Medicaid are void since they are contrary to the public policy of this State. The rights of patients . . . are absolute legal obligations owed to the patient and to the State as a condition of facility licensure and participation in the Medicaid program. Such rights may not be waived.
Memorandum at 2. *Page 22 
 Therefore, [such] clauses . . . are void at the time the admissions agreement is signed since they do not correctly inform the patient of his/her rights (e.g. the right of a patient to apply for Medicaid when funds are exhausted and that a facility with a Medicaid provider agreement has agreed to accept Medicaid payment as "payment in full").
 The clauses mislead patients into believing that . . . despite eligibility, the patient is prevented from applying for Medicaid.
Memorandum at 3-4.
C. Wisconsin Law
Various provisions of Wisconsin law that evince a public policy determination similar to that of the authorities discussed above suggest that Wisconsin courts might adopt the position espoused in Summit Nursing Home and Glengariff Corp. if presented with the question. Section 49.49 (4), Stats., is virtually identical to42 U.S.C. § 1396h(d) (1977) and was modeled after the latter. Section 49.45 provides in part:
 (14) Charges imposed forbidden, exceptions. No provider may impose upon a recipient charges in addition to payments received for services under this section or impose direct charges upon a recipient in lieu of obtaining payment under this section . . . . . . . .
 . . . . (b) If an applicant is determined to be eligible retroactively under s. 49.46 (1)(b) and a provider bills the applicant directly for services and benefits rendered during the retroactive period, the provider shall, upon notification of the applicant's retroactive eligibility, submit claims for reimbursement under this section for covered services or benefits rendered during the retroactive period. Upon receipt of payment, the provider shall reimburse the applicant or other person who has made prior payment to the provider . . . .
Section HSS 106.04 (2)(b) of the Wisconsin Administrative Code, entitled "Payment on claims for reimbursement," has similar provisions.
Wisconsin nursing homes must honor residents' rights guaranteed by section HSS 132.31 of the Wisconsin Administrative Code in order to participate in Medicaid. Ss. HSS 105.10 (2)(k) and *Page 23 
HSS 105.115 (11), Wis. Adm. Code. These standards must be enforced by the state as a condition of federal funding. Resident v. Noot,305 N.W.2d 311 (Minn. 1981). The rights apply to all residents in a Medicaid certified nursing home, be they program recipients or private pay, simply as a condition for participation in the program. This enumeration of rights states that a resident can be involuntarily discharged or transferred essentially only for medical reasons, his or her welfare or that of other patients, or for non-payment. Ss. HSS 132.31 (1)(j) and HSS 132.53 (2)(b), Wis. Adm. Code. Conversion of status from private pay to Medicaid and the corresponding loss of revenue to the nursing home cannot be considered nonpayment. Sec. 49.45 (14), Stats.; s. HSS 106.04, Wis. Adm. Code. Therefore, contract provisions prohibiting a person from applying for Medicaid, under the guise of requiring a certain length of stay as a private pay resident, cannot be enforced by threats of discharge.
My conclusion is fortified by the fact that the Department of Health and Social Services has recently put all Wisconsin nursing home providers on notice that violations of private pay duration of stay agreements cannot be grounds for discharge.[4] The memo requires that all present and prospective residents be so notified. BQC-85-019 at 2-3.
It should also be pointed out that providers who continue to utilize such contract provisions may be subject to injunctive sanctions. An open and continuous violation of state law may be deemed a public nuisance and prosecuted as such. See e.g., Statev. J.C. Penney, 48 Wis.2d 125, 151-55 (1970).
II.
The second issue suggested by your question is whether the use of such contract provisions could subject a nursing home to termination from participation in Medicaid. I conclude that under certain conditions a provider could be excluded from the program for such conduct.
Section 42 U.S.C. § 1395cc, entitled "Agreements with providers of service," provides in part as follows: *Page 24 
 (a)(1) Any provider of services . . . shall be qualified to participate under this subchapter . . . if it files with the Secretary an agreement —
 (A) not to charge, except as provided in paragraph (2), any individual or any other person for items or services for which such individual is entitled to have payment made under this subchapter (or for which he would be so entitled if such provider of services had complied with the procedural and other requirements under or pursuant to the subchapter or for which such provider is paid pursuant to the provisions of sec. 1395f(e) of this title), and
. . . .
 (b) An agreement with the Secretary under the section may be terminated . . .
. . . .
 (2) by the Secretary . . . after the Secretary has determined (A) that such provider of services is not complying substantially with the provisions of such agreement, or with the provisions of this subchapter and regulations thereunder . . . .
Section HSS 106.06 of the Wisconsin Administrative Code, entitled "Involuntary termination, suspension or denial of eligibility for program participation," provides in part:
 The department may suspend or terminate the certification of any . . . provider . . . if . . . the department finds:
. . . .
 (17) The provider has in addition to claiming reimbursement for services provided a recipient, imposed a charge on the recipient for such services or has attempted to procure payment from the recipient in lieu of claiming reimbursement through the program contrary to provisions of HSS 106.04 (2).
Therefore, it is my opinion that attempts to enforce such contract provisions when Medicaid eligibility is reached could lead to expulsion from the program.
III.
The final question presented by your inquiry is whether the use of the disputed contract provisions constitutes a violation of criminal law. I conclude that in certain circumstances their continued use *Page 25 
could subject the nursing home or its agents to criminal prosecution.
There can be little doubt that the solicitation of such provisions in an admission agreement with a certified Medicaid recipient, or an attempt to enforce the agreement, constitutes a violation of the criminal statutes in question. The section you cite, 42 U.S.C. § 1396h(d), obviously proscribes exactly this type of conduct. The corresponding state statute, section 49.49
(4), was modeled after section 1396h(d) and is nearly identical:
 (4) Prohibited charges. No person, in connection with the medical assistance program when the cost of the services provided to the patient is paid for in whole or in part by the state, may:
 (a) Knowingly and wilfully charge, for any service provided to a patient under a medical assistance program, money or other consideration at a rate in excess of the rates established by the state.
 (b) Knowingly and wilfully charge, solicit, accept or receive, in addition to any amount otherwise required to be paid under a medical assistance program, any gift, money, donation or other consideration, other than a charitable, religious or philanthropic contribution from an organization or from a person unrelated to the patient, as a precondition of admitting a patient to a hospital, skilled nursing facility, or intermediate care facility, or as a requirement for the patient's continued stay in such a facility.
 (c) Violators of this subsection may be fined not more than $25,000 or imprisoned for not more than 5 years or both.
Section 49.49 (4) and 42 U.S.C. § 1396h(d) (1977) have not been construed in any reported appellate decisions. However, their relevance here is obvious. Under section 1396h(d)(2), the instigator of the disputed contract provisions would be a person who "knowingly and wilfully . . . solicits . . . in addition to any amount otherwise required to be paid under a State plan . . . money . . . as a precondition of admitting a patient . . . when the cost of the services . . . is paid for (in whole or in part) under the State plan . . . ." And, similarly, there would be culpability under section 49.49 (4) for a person who "when the cost . . . is paid for in whole or in part by the state . . . knowingly and willfully . . . solicit[s] . . . money . . . as a precondition of admitting a patient . . . ." *Page 26 
A much more difficult question is presented when the prospective resident enters into the agreement and is on private pay status, or when the resident would qualify for medical assistance if application were made, but refrains from so doing under the cloud of the contract. Although whether the courts would so hold is too close a question for me to venture a conclusive opinion, providers put on notice by the July 26, 1985, Department of Health and Social Services memo, and this opinion, run a high risk of jeopardy by the continued use of such contract provisions. An argument can be made that the phrase in the state statute (and its counterpart in the federal statute) that "when the cost of services provided to the patient is paid for in whole or in part by the state" can be interpreted as including services that could have been paid for by Medicaid if application had been made.
"Although we recognize the general rule . . . that penal statutes are to be strictly construed in favor of the accused, it is equally true that this rule of construction does not mean that only the narrowest possible construction must be adopted in disregard of the purpose of the statute." State v. Tronka,84 Wis.2d 68, 80, 267 N.W.2d 216 (1978) (citations omitted). "[T]he rule of strict construction is not violated by taking the commonsense view of the statute as a whole and giving effect to the object of the legislature, if a reasonable construction of the words permits it." Zarnott v. Timken-Detroit Axle Co.,244 Wis.2d 596, 600, 13 N.W.2d 53 (1944). The meaning of a statutory phrase must be considered in light of the entire statute. Statev. Fouse, 120 Wis.2d 471, 355 N.W.2d 366 (Ct.App. 1984). InBoyce Motorlines v. United States, 342 U.S. 337 (1952), the Supreme Court stated that it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."342 U.S. at 340 (citations omitted).
Our supreme court and court of appeals have had occasion to construe both penal and remedial statutes more broadly than a literal interpretation would allow. In Wisconsin Granite Co. v.Industrial Comm., 208 Wis. 270, 242 N.W.2d 191 (1932), one section of the Worker's Compensation Act that significantly restricted the scope of another was disregarded in order to effectuate legislative intent. In McLeod v. State,85 Wis.2d 787, 271 N.W.2d 157 (Ct.App. 1978), one of two contradictory provisions of the battery-to-a-witness statute was disregarded in order to expand its protection *Page 27 
to persons who had not yet testified as witnesses. In State v.S S Meats, Inc., 92 Wis.2d 64, 284 N.W.2d 712 (Ct.App. 1979), section 161.55, entitled "Forfeitures," was construed to avoid a literal reading that would have severely curtailed the statute's applicability.
It is my opinion, therefore, that continued use of these contract provisions, after having been put on notice by this office and the Department of Health and Social Services of their suspect nature, could well be the impetus for the courts to interpret the criminal statute in a manner designed to effect its purpose and find a knowing and willful violation of law.
BCL:MJL
[1] "MEDICAID MEMO" to All Hospital and Nursing Homes Participating in the Virginia Medical Assistance Program, dated April 21, 1980, from Robert Treibley, Acting Director of the Virginia Medicaid Assistance Program, p. 1.
[2] Letter dated August 19, 1983, from Conrad Thompson, Director of the Bureau of Nursing Home Affairs, state Department of Health and Social Services, to State of Washington nursing home providers, p. 1-2.
[3] Advice of Counsel letter to the state Director of the Medical Assistance Compliance Administration, Office of Medical Care Programs, dated July 7, 1982. p. 1-11.
[4] BQC-85-019, Memo to All Wisconsin Nursing Homes from the Director of the Bureau of Quality Compliance, dated July 26, 1985. *Page 28