KOHLER COMPANY, Respondent, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, Appellant: MATTHIAS, Defendant.

*No. 24.   Argued March 3, 1969.—Decided May 6, 1969.*
(Also reported in 167 N. W. 2d 431.)

398

For the appellant Department of Industry, Labor &
Human Relations the cause was argued by *James P.*

*Altman,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For the respondent there was a brief by *E. J. Hammer* and *K. W. Conger,* both of Kohler, and oral argument by *Mr. Hammer.*

ROBERT W. HANSEN, J. When the Wisconsin legislature amended the Workmen's Compensation Act to provide benefits for disability caused either by industrial accident or occupational disease, it ended all doubt as to its intent. It did not eliminate all difficulties in implementing that intent. This is particularly so in cases, as we have here, involving occupational disease.

An industrial injury or accident is an event, fixed as to time and place. There may be dispute as to the fact of such injury, place of injury, extent of injury or consequences of injury. But the focus is on a particular occurrence at a certain place and definite time.

An occupational disease is a process, usually extending over a considerable span of time. It has a beginning, relevant on the issue of causation. It has a progression but this can vary in individual cases. There can be a steady deterioration, swift or slow but uninterrupted. There can be improvement and relapse. There can be recovery and reoccurrence. There can be recovery, period. On a claim for benefits for permanent disability, most important is the question, When did the occupational disease ripen into a disabling affliction?

*Causation.*

Here there is dispute as to the inception of the occupational diseases involved: Silicosis and emphysema. The treating physician testified that the X ray taken by the employer on May 10, 1949, showed the first signs of silicosis and that the emphysema had arisen as a result of the silicosis. However, there is no room for doubt that both arose out of his employment by the Kohler Company. Henry J. Matthias worked for the Kohler firm

from 1910 to 1962 as a coremaker and molder. This was work which brought him into contact with hot, dry, free-falling sand and a dusty work atmosphere. The department's finding that his work caused his affliction cannot be challenged.

*Progression.*

Here there is a single employer, so we need not cite cases dealing with the question of who is liable as between different employers of the same workman. Nor do we have here the roller-coaster succession of ups-and-downs that involves determining whether the initial disease persisted or whether recovery was followed by the onset of a new attack. Given the nature of the afflictions here involved, the record gives no reason to doubt that a slow but sure deterioration of the physical condition of the claimant occurred. (The treating physician testified that, while the emphysema was progressing, it was difficult to follow the silicosis on the X rays, the changes throughout the years can be called progression.) There may have been plateaus, but the general movement was downhill.

*Ripening.*

In this case the department made the finding of fact that ". . . the applicant sustained an injury caused by an occupational disease in the nature of silicosis and emphysema arising out of his employment by the respondent; that this injury was sustained while the applicant was performing services growing out of and incidental to his employment by the respondent; . . . that as a result of the injury, the applicant sustained permanent partial disability to the extent of 50 percent of permanent total disability." Appellant concedes that these findings as to permanent partial disability stand or fall on the testimony of the treating physician, Dr. Raymond H. Evers.

Dr. Evers was identified as the treating physician, and further qualified as an expert in the interpretation of

X rays. He first treated Henry Matthias on August 7, 1963, and subsequently on April 7, 1964, April 13, 1965 and on April 28, 1967. On April 28, 1967, he administered a pulmonary function test which revealed that his patient's lung function was only 50 percent of normal. He had viewed the chest X rays taken of Matthias by the Kohler Company every year since 1942. At the hearing he testified that he found a 50 percent permanent partial disability "comparing this man with a man who would be permanently totally disabled."

Five doctors testified in this case, three for the company, two for the applicant. There is disagreement between them. It is apparent that the department elected to accept the testimony of Dr. Evers, the treating physician, both as to the time of ripening of permanent partial disability and as to the degree of such disability. As the trier of fact it had the right so to do. Its finding is to be upheld if there is credible evidence to support the finding.[1] It should be mentioned that sec. 102.01 (2), Stats., provides that the date of injury in workmen's compensation cases involving occupational disease is "the last day of work for the last employer whose employment caused disability." In this case, that last employer is the Kohler Company. In fact, it was and is the first, last and only employer.

*Fact of retirement.*

Respondent contends that the right of the claimant to seek benefits is cut off by the fact that he voluntarily retired from his job with respondent. This claim places great stress on the statement made by the claimant when he terminated his employment that, "After you're 66 years old—66½ years old, most of the time you haven't got much left of your life you might as well take a little

[1] *Reich v. ILHR Department* (1968), 40 Wis. 2d 244, 262, 161 N. W. 2d 878; *Revels v. Industrial Comm.* (1967), 36 Wis. 2d 395, 401, 153 N. W. 2d 637.

retirement out of it." Particularly where he did not then know the extent of the attrition of the two occupational diseases with which he was afflicted, we would hold such statement to be material but not determinative. It is his physical condition as to medical or actual disability, as established by competent medical testimony, that controls, not his appraisal of his health at that time. Many a retiree at a farewell or testimonial affair has spoken glowingly of his great desire to fulfill a long repressed desire to go fishing or to travel or to rock in a rocking chair. Often enough this may be the entire truth. As often it may be a very human but not entirely accurate putting of a best foot forward, making the best of a mixed emotions situation. In any event such statement of a retiree does not always give the full reasons for retirement nor the true physical condition of the person leaving employment.

Nor can we agree that accepting Social Security old age benefits moves one into a fixed class or category. The decision to cease working is not fixed or irrevocable. Many a person has started drawing his Social Security benefits, only to change his mind and re-enter the employment market. Retirement living is a blessing to many, an empty vacuum for others. In fact, the Social Security Act itself permits supplementary earnings up to a certain limit in a calendar year without diminution of the retirement allowance. Where an employee quit his employment to take a vacation, returned to his cottage in the northwoods, and from that time suffered a rapid deterioration in health, this court said:

"There was no doubt that Terve was suffering from silicosis when he took his vacation . . . ." [2]

It is not the circumstances of the termination of employment that are controlling. It is the actual or medical

---

[2] *North End Foundry Co. v. Industrial Comm.* (1935), 217 Wis. 363, 258 N. W. 439.

or pathological condition of the worker at the time of termination that is controlling. This is to be established by medical testimony, not by reliance, at least not alone, on the circumstances of the termination. In a case where the claimant had worked for nine different employers, this court was confronted with the problem of determining which employer was liable under the compensation act.[3] One job the claimant had quit because he disliked the work. On another he had been discharged because his work was unsatisfactory. Another employer had laid him off because the work force was reduced. On his last job he had quit on advice of a physician, and had been unemployed up until the filing of the claim. The holding that liability depends upon when the disability occurred is not needed here, but the case is cited to mention that, in finding the last employer not liable and finding that there was but a recurrence of a disability because of the diseases (silicosis and tuberculosis) which had theretofore existed, this court made no mention of the varying circumstances under which earlier employments had terminated. This was no oversight. It is when the disability occurred that determines employer liability not the circumstances of leaving the employment. It is what his condition was, not why or how he left the job that is important.

*No loss of wages.*

Respondent contends that the awarding of benefits to the claimant is barred by the fact that claimant did not sustain an actual loss in actual earnings. As to this contention, Larson on Workmen's Compensation states: ". . . there are three major schools of thought on what disability means in compensation law: the actual wage-loss theory, the whole-man theory, and the loss-of-earn-

[3] *Outboard Motor Co. v. Industrial Comm.* (1931), 206 Wis. 131, 239 N. W. 141.

ing-capacity theory." [4] Under the wage loss concept, strictly applied, any quitting or terminating of employment except because one cannot continue to perform his former duties would be an impediment to a finding of compensable disability. While cases can be found indicating that the wage loss must be established, Wisconsin has not, at least in recent cases, held to such a purist view. Larson lists Wisconsin as one of the jurisdictions that has given the Workmen's Compensation Act a more liberal construction in recoveries for disability caused by industrial diseases. Whether or not he was correct when he made such evaluation, he will be now for we interpret recent cases to have made possible recovery in occupational disease cases where no actual loss of wages is involved.

The watershed between yesterday and today in this area came, as Larson points out, with the *Northern States Power Co. Case* [5] which construed the statutes to leave no disparity between schedule and relative injuries on the one hand and nonschedule injuries causing permanent partial disability on the other, holding that an award for permanent disability must be based upon some sort of prediction as to impairment of earning capacity.

In the *Kurschner Case* [6] this court pointed out that the *Northern States Power Co. Case* did not read earning capacity out of the concept of disability. In *Kurschner,* an award was made for permanent partial disability occasioned by chronic low back strain and chronic thrombophlebitis. The injury occurred while the employee was attempting to empty an 80 to 90 pound bucket of turkey

[4] 2 Larson, *Law of Workmen's Compensation,* p. 7, sec. 57.10.

[5] *Northern States Power Co. v. Industrial Comm.* (1947), 252 Wis. 70, 30 N. W. 2d 217.

[6] *Kurschner v. ILHR Department* (1968), 40 Wis. 2d 10, 161 N. W. 2d 213.

gizzard peelings into a 50-gallon drum. There this court said:

"Thus it appears that the injuries of an applicant (nonschedule but permanent total or partial) are to be compared medically with injuries that would render a person permanently totally disabled for industrial purposes . . . and *not* to injuries that would totally disable a person functionally without regard to loss of earning capacity." (Emphasis in the original.) [7]

Thus, as to nonschedule and nonrelative permanent disabilities, in this state the effect on earning capacity is a conclusively presumed one instead of a specifically proved one based on the individual's actual wage loss experience. As Larson explains:

"The effect must necessarily be a presumed one, since it would be obviously unfair to appraise the impact of a permanent injury on earning capacity by looking at claimant's earning record for some relatively short temporary period preceding the hearing." [8]

The remaining question is whether this concept of disability necessarily including loss of earning capacity applies to disability caused by an occupational disease, as well as to other nonschedule and nonrelative permanent disability cases. There is no reason to carve out an exemption for occupational disease cases. Sec. 102.01 (2), Stats., includes "mental or physical harm to an employee caused by accident *or disease*." (Emphasis supplied.)

This holding was clearly suggested by this court in the *Wagner Case* where the statement is made:

"In the case of a nonschedule or relative injury due to industrial accident, such as was involved in the *Northern States Power Co. Case,* it is possible for a physician to examine the injured employee, after the healing period

---

[7] *Kurschner v. ILHR Department, Id.* page 18.

[8] 2 Larson, *Law of Workmen's Compensation,* p. 88.42, sec. 58.10.

has been completed, to determine whether there has been any impairment of body functions. If such impairment is found, it is further possible for the physician to determine the ratio which such impairment bears to total disability and place a percentage on such permanent partial disability. *In case of some partially disabling occupational disease it may be also possible for a physician by physical examination to determine the percentage of permanent partial disability . . . .*" [9] (Emphasis supplied.)

In the *Wagner Case,* the court held that it was impossible to make such examination and determine such percentage because the sensitivity produced by the dermatitis (the ailment there included) "cannot be measured objectively." Here we deal with silicosis and emphysema, not with dermatitis. Not only do we have the testimony of the treating physician, Dr. Evers, as to 50 percent permanent partial disability, but his prognosis that ". . . five years from now it might be more and it probably will be—or two years from now." The basis of comparison is with a man permanently totally disabled and the department was entitled to accept the testimony of the doctor in this regard.

While we agree that there is no right to compensation for permanent disability until there is disability, we hold that an actual loss of earnings is not an additional prerequisite. Actually, we hold here exactly what was held by this court in the *Schaefer Case.* [10] The facts are very nearly identical. There the employee had worked for the monument company employer for twenty-six years. A different insurance carrier went on the risk which required that the men employed be examined. As a result of such examination it was discovered the defendant had silicosis. He was discharged and did not work

[9] *Wagner v. Industrial Comm.* (1956), 273 Wis. 553, 567c, 79 N. W. 2d 264, 80 N. W. 2d 456.

[10] *Schaefer v. Industrial Comm.* (1936), 220 Wis. 289, 265 N. W. 390.

following the date of discharge. The claimant, told of his discharge, claimed that he was all right and could continue to do his work. The examiner found that applicant was suffering from an advanced stage of silicosis and that exposure in the employer's plant caused his condition, and awarded 50 percent permanent partial disability. Under the "actual wage loss" test, this court found a "wage loss" even though the employee had not lost any wages prior to his discharge, and had not worked thereafter. Hindsight is always easy, but we believe that the court might as well have conceded that it was permitting recovery when the only wage loss sustained was that occurring after the employment relationship had ceased and that it was based upon the loss of earning capacity, as medically established, of the victim of the disabling occupational disease. This would have been an implementing of the court's statement: ". . . the primary purpose of the law as of all Workmen's Compensation Acts, is to compensate in some measure injured workmen for *loss of wage-earning power* sustained in the industry . . . ." [11] (Emphasis supplied.)

*Lack of notice.*

Respondent contends that the claim here involved is barred by the failure to give notice under sec. 102.12, Stats., particularly the portion thereof requiring a claimant to give notice within two years from the date of injury. The claimant was not required to give notice when he knew or should have known that he had silicosis and emphysema. He was required to give notice when he knew or should have known that he was suffering a permanent partial disability. In this case that was on April 28, 1967. His application for a hearing before the department was filed on May 17, 1967.

[11] *Schaefer v. Industrial Comm. Id.*

In a case where a finding of compensable disability was made in an occupational disease case, this court said: "While he failed to give notice of the injury to the Kannenberg Granite Company, it is plain that there was no intention to mislead the employer and it was not misled thereby." [12] Under this test it is clear that here there was no intention to mislead and no basis for a claim of being misled. Over the years, by reasons of the company's X rays, the Kohler Company knew more about the true condition of the claimant than he did. The summary sheet of the Kohler X rays shows this entry:

"No. 47603   10–10–63 Flat Plate-Thorax Comparison with previous films reveals change. This film shows increased evidence of emphysema and also increased granularity. It is probable that this patient has emphysema with superimposed silicosis. Actually the upper area, the apical area are more suspicious of silicosis than the bases and it is likely that the emphysema has obliterated many of the findings of the silicosis."

Finding both that the employer had notice and, in any event, was not misled by any lack of notice conforms to the reasons given by this court for a less than strict interpretation of the requirement of notice in workmen's compensation cases. [13]

[12] *Kannenberg Granite Co. v. Industrial Comm.* (1933), 212 Wis. 651, 250 N. W. 821.

[13] "The deceased had been employed for eleven years in a dusty occupation. It is a matter of common knowledge that such occupations give rise to lung troubles and that a continued exposure increases the difficulty and greatly diminishes the chances of recovery. While this does not appear in the evidence, it is a matter of common knowledge . . . While the employee did not have notice under the workmen's compensation act in mind, the employer nevertheless was made aware of all the essential facts and was not misled. While the notice is far from satisfactory and was informal, we are inclined to the view that the evidence was sufficient to sustain the finding of the commission that the employer, under the particular circumstances of this case, had 'actual notice' within the meaning of the statute. . . . The first

*By the Court.*—Judgment reversed, and cause remanded with directions to reinstate the order of the Department of Industry, Labor & Human Relations.

concern of course should be the interests of the impaired workman. This is so as a matter of law, not of favor. The whole purpose and philosophy of the workmen's compensation laws indicate that. If this needs any other confirmation than it already has in decided cases, it is certainly indicated by the fact that the legislature provided that in occupational diseases the employer should not be misled by failure to give notice until the employee 'knew or ought to have known the nature of the disability and its relation to the employment.'" *Zurich General Accident & Liability Ins. Co. v. Industrial Comm.* (1930), 203 Wis. 135, 142, 145, 233 N. W. 772.