VIRGINIA SURETY CO., INC., and Stainless Foundry & Engineering, Inc., Plaintiffs-Appellants,†

v.

WISCONSIN LABOR AND INDUSTRY REVIEW COMMISSION, TIG Insurance Company, State of Wisconsin Work Injury Supplemental Benefit Fund, and Thomas McGaw, Defendants-Respondents,

STAINLESS FOUNDRY & ENGINEERING, INC., Defendant.

Court of Appeals

*No. 02–0031. Oral argument October 1, 2002.—Decided October 22, 2002.*

2002 WI App 277

(Also reported in 654 N.W.2d 306.)

† Petition to review denied 2-19-03.

667

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Christine K. Nelson* of *Nelson, Connell & Kramer, S.C.*, Brookfield. There was oral argument by Christine K. Nelson.

On behalf of the defendant-respondent, Wisconsin Labor and Industry Review Commission, the cause was submitted on the brief of *Jeffrey J. Shampo*, Madison. There was oral argument by *Jeffrey J. Shampo*.

On behalf of the defendant-respondent, TIG Insurance Company, the cause was submitted on the brief of *Michelle L. Danielson* of *Halling & Cayo, S.C.*, Milwaukee. There was oral argument by *Roland Cafaro*.

On behalf of the defendant-respondent, State of Wisconsin Work Injury Supplemental Benefit Fund, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Stephen M. Sobota*, assistant attorney general. There was oral argument by *Stephen M. Sobota*.

On behalf of the defendant-respondent, Thomas McGaw, the cause was submitted on the brief of *Michael H. Gillick* of *Murphy, Gillick, Wicht & Prachthauser*, Milwaukee. There was oral argument by *Michael H. Gillick.*

Before Fine, Schudson and Curley, JJ.

¶ 1. FINE, J. Virginia Surety Company, Inc., and its insured, Stainless Foundry & Engineering, Inc., appeal from an order of the trial court affirming a decision by the Labor and Industry Review Commission that determined that Virginia Surety was the worker's compensation carrier liable for occupational disability payments to Thomas McGaw for the silicosis-based disability he developed during his employment for Stainless Foundry & Engineering, even though Virginia Surety's policy became effective on July 1, 1997, less than two months before McGaw was forced to stop working because of his disability. The issue presented by this appeal is whether employer-required medical examinations for an occupation-caused condition that ultimately results in the employee's disability set the "date of disability" as that term is used in the governing statute, WIS. STAT. § 102.01(2)(g)2, when those examinations cause the employee some "wage loss" but the employee does not otherwise miss work until the disability ripens into a physical incapacity to work. As material here, § 102.01(2)(g) provides that, under the worker's compensation law, " 'time of injury', 'occurrence of injury', or 'date of injury' means: . . . 2. In the case of disease, the date of disability." The Commission held that McGaw's "date of disability" was the date when he could no longer work and not when he underwent employer-required medical examinations. We affirm.

## I.

¶ 2. McGaw started to work for Stainless Foundry & Engineering in 1954, when he was eighteen. With the exception of two years in the armed forces, he worked continuously for Stainless Foundry until August 25, 1997, which was his last day of work. During most of that time he was a grinder and was exposed to sand and dust resulting from grinding stainless steel castings. This exposure resulted in his silicosis, which, all parties agree, produced his work-preventing disability. According to the Commission's findings that are not disputed on this appeal, "prior to his last day of work in August 1997, [McGaw] never missed any time [from work] because of the symptoms from his condition." But McGaw was hardly symptom free. Indeed, the record before the Commission reveals that as early as 1983 his x-rays were abnormal.

¶ 3. In October of 1983, McGaw was examined at the direction of Stainless Foundry & Engineering by Richard G. Harbecke, M.D., because, as noted in his medical records, McGaw's then most recent routine employer-administered x-ray "was felt to show more abnormalities than in the past." The record indicated, however, that McGaw "has had essentially no symptoms." Dr. Harbecke concluded that McGaw "has simple early silicosis, and that there is no more serious process going on." Dr. Harbecke also noted: "At this point, I think the dust control measures that [McGaw] has described are adequate, and [I] do not feel he has to be prohibited from working." In November of 1983, McGaw underwent a bronchoscopy as part of Dr. Harbecke's evaluation "with transbronchial lung biopsies," which showed "chronic interstitial pneumonitis without granulomas or typical changes expected with silicosis although silicosis could still not be ruled out."

671

Although at oral argument, Virginia Surety pins the bronchoscopy as McGaw's "date of injury" because he had to be in the hospital, McGaw was, again, reported to be "asymptomatic." Dr. Harbecke wrote to Stainless Foundry & Engineering in March of 1984 that McGaw had "early, nondisabling silicosis."

¶ 4. In 1990, McGaw was re-examined—again at Stainless Foundry's direction. In a letter to McGaw, Dennis Schultz, M.D., reported that there were "old" "abnormal findings" on McGaw's x-rays, "which could be explained by past silica exposure." Dr. Schultz noted that while McGaw's breathing test was "mildly abnormal," which "could also be explained by silicosis," Dr. Schultz did "not expect [McGaw to] develop any complaints in the future." Among other things, Dr. Schultz opined that McGaw was "medically qualified to use a respirator at work," and Dr. Schultz did not recommend "any restrictions for [his] usual job, but would recommend that [McGaw] continue to avoid any significant silica exposures."

¶ 5. In 1991, McGaw was examined by Marc Rasansky, M.D., a pulmonary specialist, to whom Stainless Foundry referred him. Dr. Rasansky examined McGaw on December 2, 1991, and reported that McGaw "denie[d] any respiratory symptoms of any type." Nevertheless, Dr. Rasansky opined that McGaw's "[p]ulmonary function studies reveal mild restriction and mild obstruction" and that McGaw's x-ray "is most consistent with complicated silicosis." Dr. Rasansky recommended that Stainless Foundry move McGaw "to an area where he has no dust exposure whatsoever" because, in Dr. Rasansky's view, "continued exposure is dangerous." A January 1994 x-ray revealed that McGaw had lungs whose "[a]ppearance is certainly quite compatible with silicosis."

¶ 6. McGaw saw Dr. Rasansky again in early February of 1997. McGaw told him that he had never smoked and, although "[h]e gives a history of intermittent shortness of breath, and he states that he becomes tired at work," McGaw "denies shortness of breath at work." Dr. Rasansky reviewed McGaw's chest x-rays and opined in a March 1997 letter that McGaw's "entire picture is most consistent with progressive massive fibrosis, complicated silicosis and secondary underlying pulmonary hypertension." Dr. Rasansky was, however, less than sanguine. He wrote that McGaw seemed to minimize his ailment and, according to Dr. Rasansky, McGaw's "disease is going to be progressive with further development of this disability." He further noted:

> I feel that [McGaw] grossly underestimates his degree of disability and symptoms. I consider him extremely ill but, as you can see from his pulmonary function studies, these studies do not totally reflect the severe underlying defect.
>
> Since the patient is wearing his respirator and his area if [sic is?] well ventilated, one cannot adamantly insist that he discontinue work; however, I would insist that [McGaw] retires at age 62. He will clearly develop increasing and more progressive symptoms over the next several years.

As we have seen, Dr. Rasansky's fears were prescient, and McGaw had to stop working in August of 1997.

¶ 7. Dr. Rasansky saw McGaw again on June 24, 1997, and his handwritten notes of that examination reveal that he diagnosed McGaw as having: "Advanced Silicosis," "Progressive Massive Fibrosis," which Dr. Rasansky opined was secondary to the silicosis, and "Pulmonary hypertension." Dr. Rasansky wrote: "I feel he is impaired" secondary to the silicosis and advised

that McGaw should "not work hot humid days." On July 10, 1997, Dr. Rasansky wrote a letter that summarized his June 24 findings:

> Thomas McGaw has pulmonary fibrosis secondary to silicosis. There is evidence of progressive massive fibrosis on chest x[-]ray.
>
> Although Mr. McGaw's pulmonary function studies are relatively preserved, I feel that his current dyspnea is totally on the basis of silicosis. I have asked Mr. McGaw not to attend work on hot, humid days. Furthermore, if he could be moved to a job outside of the plant where there is no dust exposure, I feel that his health would improve.

¶ 8. McGaw did not follow Dr. Rasansky's advice. He testified at the administrative hearing that he never missed any work because of his silicosis symptoms between June 24, 1997, when he saw Dr. Rasansky, and August 25, 1997, when he stopped working and that he "just struggled through" hot, humid days during that time.

¶ 9. Dr. Rasansky's findings were echoed in a September 1999 report by Stuart A. Levy, M.D., submitted by Virginia Surety. Dr. Levy examined McGaw in late August of 1999 at Virginia Surety's request. He concluded:

> Mr. McGaw's employment at Stainless Foundry and Engineering was a material contributory causative factor in the onset and progression of silicosis. The work exposure did not aggravate or accelerate a preexisting condition. The onset of the condition of silicosis was a direct result of his work place exposure at Stainless Foundry and Engineering.

Dr. Levy also opined:

674

> To a reasonable degree of medical probability, the exposure to silica between 1954 and approximately 1986, when measures taken by Stainless Foundry and Engineering became effective in reducing silica dust levels below the PEL [permitted exposure level], would have been sufficient to account for the development of silicosis in Mr. McGaw. The mechanism for the development of silicosis explains progression of fibrosis even in the absence of further exposure as a result of either improved environmental measures or even leaving the work place.

The record does not further explain what the "permissible exposure limit" was, how it was derived, its validity, or its application to the issue in this case, other than as support for Virginia Surety's contention that McGaw developed disabling silicosis well before it assumed liability for Stainless Foundry & Engineering's compensation claims on July 1, 1997.

¶ 10. The following are not disputed by any of the parties on this appeal:

- Other than his company-directed medical evaluations, McGaw never missed work because of a physical incapacity caused by his silicosis until August 25, 1997; and

- McGaw took either vacation or other remuneration-based time to undergo the company-directed medical evaluations.

## II.

¶ 11. When an appeal is taken from a circuit court's review of a decision by the Commission, we review the Commission's decision and not that of the circuit court. *General Cas. Co. of Wis. v. Labor & Indus.*

*Review Comm'n*, 165 Wis. 2d 174, 177 n.2, 477 N.W.2d 322, 323 n.2 (Ct. App. 1991). On such a review, the Commission's findings of fact are invulnerable unless they are not "supported by credible and substantial evidence." *Id.*, 165 Wis. 2d at 178, 477 N.W.2d at 324. Although on legal matters the scope of our review is more broad, we recognize that legal analyses by agencies who have developed expertise in an area are entitled to deference. *Knight v. Labor & Indus. Review Comm'n*, 220 Wis. 2d 137, 147–149, 582 N.W.2d 448, 453 (Ct. App. 1998).

■■■■

¶ 12. We give "great weight" to the legal conclusions of the agency "when the following four elements are met: (1) the agency is responsible for administering the statute, (2) the agency conclusion or interpretation is long standing, (3) the agency employed its specialized knowledge or expertise in forming the conclusion or interpretation, and (4) the agency interpretation provides consistency and uniformity in the application of the statute." *Id.*, 220 Wis. 2d at 148, 582 N.W.2d at 453. We give "due weight" when "the agency interpretation is 'very nearly' one of first impression." *Ibid.* (quoted source omitted). Finally, we review *de novo* the agency's legal conclusions when they are matters of first impression. *Id.*, 220 Wis. 2d at 149, 582 N.W.2d at 453.

■■■■

¶ 13. As seen below, the Commission's determination to disregard company-required medical examinations from the calculus in deciding on a "date of disability" under Wis. Stat. § 102.01(2)(g)2 relied on several of its own decisions interpreting the key court cases. Although these Commission decisions are fairly recent, they reflect an emerging doctrinal interpretation of the

676

worker's compensation statute, which it is charged with administering. Thus, at least three of the four requirements for giving the Commission's decision great-weight deference are present. Moreover, although the Commission has never decided a case presenting the precise facts raised by this appeal, that is not a prerequisite to giving the agency great-weight deference. *Honthaners Rests., Inc. v. Labor & Indus. Review Comm'n*, 2000 WI App 273, ¶ 12, 240 Wis. 2d 234, 243, 621 N.W.2d 660, 664.

■

¶ 14. Giving an agency's decision great-weight deference means that we will uphold it if it is reasonable. *Id.*, 2000 WI App 273 at ¶ 13. As we show below, however, the Commission's decision here is more than reasonable; it also passes the due-deference test, urged upon us as an alternative argument in Virginia Surety's reply brief, because "it is reasonable and comports with the purpose of the statute," and another interpretation is not "more reasonable." *See American Mfrs. Mut. Ins. Co. v. Hernandez*, 2002 WI App 76, ¶ 17, 252 Wis. 2d 155, 165, 642 N.W.2d 584, 589.

■

¶ 15. All the parties agree that McGaw is disabled. Indeed, Stainless Foundry & Engineering refused to let him work any longer because of his disability. All parties also agree that McGaw's disability stems from his work for Stainless Foundry. His disability, however, did not emerge in an instant, as industrial accidents generally do. *See Kohler Company v. Department of Indus., Labor & Human Relations*, 42 Wis. 2d 396, 400, 167 N.W.2d 431, 432 (1969) ("An industrial injury or accident is an event, fixed as to time and place."). Rather, it developed slowly. As *Kohler Company* observed:

> An occupational disease is a process, usually extending over a considerable span of time. It has a beginning, relevant on the issue of causation. It has a progression but this can vary in individual cases. There can be a steady deterioration, swift or slow but uninterrupted. There can be improvement and relapse. There can be recovery and re-occurrence. There can be recovery, period. On a claim for benefits for permanent disability, most important is the question, When did the occupational disease ripen into a disabling affliction?

*Ibid.* Where disability results from such a progressive disease, like silicosis, where there is a continuum of impairment that slowly ripens into a barrier to further work, there is a "conclusive presumption" that the "date of disability" under the statute is "when the employee first suffers a wage loss due to" that condition. *General Cas. Co.*, 165 Wis. 2d at 181, 477 N.W.2d at 325. This is because there cannot be a "date of disability" unless there is a "disability" and evidence of "disability" is the inability to work and resulting non-compensation. *See Montello Granite Co. v. Industrial Comm'n*, 227 Wis. 170, 186, 278 N.W. 391, 398 (1938) ("no disability in an occupational-disease case in the absence of a showing of a wage loss"); *North End Foundry Co. v. Industrial Comm'n*, 217 Wis. 363, 369–371, 377, 258 N.W. 439, 441–442, 445 (1935) (workers fired because employer feared that they would *become* disabled on the job not entitled to worker's compensation when there was no "inability to perform" their work at time of termination). Of course, the "wage loss," need not be *actual* loss of dollars; loss of remunerative compensation, whether "sick leave, vacation time, or flexibility of schedule," suffices. *General Cas. Co.*, 165 Wis. 2d at 181–182, 477 N.W.2d at 325–326.

678

¶ 16. As noted earlier, none of the parties disputes that McGaw suffered a "wage loss" when he underwent medical evaluations at Stainless Foundry's direction. Virginia Surety contends that those visits thus establish the "date of disability" by virtue of the "conclusive presumption" recognized by *General Cas. Co.* The Commission disagreed:

> A conclusive presumption, of course, is an irrebuttable presumption. However, the commission declines to read *General Casualty* to eliminate completely the need to consider when the occupational disease has ripened into a disabling condition. Rather, the commission itself has held that "the date of disability has consistently been interpreted by courts to be the first wage loss through lost work time *attributable to the effects of occupational disease." Adams v. Cub Foods*, WC Claim no. 91–074342 (LIRC, March 31, 1993) (italics supplied).

> *Adams* indicates that the wage loss used to set a date of disability may not just be somehow associated with the occupational disease in the broadest sense, but must be "attributable to the effects of" the occupational disease. In other words, *Adams* suggests the wage loss must be due to the symptomatic effects of the work injury, not simply the employer's desire to monitor a nondisabling condition. One could conclude from *Adams* that an employer cannot convert a nondisabling silicosis into a disabling condition with a "date of disability" simply by requiring a medical examination, an x-ray or other diagnostic test. Instead, the occupational disease must have "ripened" into a disabling condition before wage loss associated with the condition will set a date of disability.

(Emphasis by the Commission in this case.) The Commission also relied on *Rothenberger v. Murray Manufacturing*, No. 1995051612, 1999 WL 55523 (Wis. Lab.

Ind. Rev. Com. 1999), and *Kalies v. Brillion Iron Works*, No. 1998–024333, 2001 WL 618651 (Wis. Lab. Ind. Rev. Com. 2001).

¶ 17. *Rothenberger* held that "the simple onset of symptoms which do not cause a worker to seek treatment or lose work time does not automatically establish a 'date of disability' fixing liability for occupational disease," because the focus is on " 'when did the occupational disease ripen into a disabling condition?' " *Rothenberger*, 1999 WL 55523, at *2 (quoting *Kohler Company*, 42 Wis. 2d at 400, 167 N.W.2d at 432). *Rothenberger* explained that: "In deciding this question, the courts look at 'actual physical incapacity to work' rather than a medical or pathological disability which results in no wage loss." *Ibid.* (quoted source omitted). Thus, employer-required monitoring x-rays and medical evaluations, in the absence of concurrent incapacity, did not set the "date of disability" even though the employee lost time from work for those evaluations. *Id.*, 1999 WL 55523, at *2–3. *Kalies* followed *Rothenberger* and held that time away from work for medical evaluations did not set the "date of disability" when the time away was not "due to physical incapacity to perform his work or due to significant restrictions on his ability to perform his work." *Kalies*, 2001 WL 618651, at *3.

¶ 18. We agree that the Commission's distinction between non-incapacitating symptoms on the one hand and incapacity to work on the other is a reasonable interpretation and comports with the intent of the statute. Indeed, *Montello Granite Co.*, upon which *General Cas. Co.* relied, noted that the supreme court had "consistently held" that under the worker's compensation act as it then existed, " 'in cases of occupational disease, in order to entitle an employee to compensa-

tion, he must have sustained *such physical incapacity* from disease as renders him incapable of performing his services *to the extent that a wage loss results.*' " *Montello Granite Co.*, 227 Wis. at 187, 278 N.W. at 398 (quoted source omitted) (emphasis added); *General Cas. Co.*, 165 Wis. 2d at 181, 477 N.W.2d at 325. *Montello Granite Co.* recognized the distinction, echoed by the Commission's decision here, "between medical or pathological disability which has resulted in no wage loss and actual disability, *i.e.,* physical incapacity to work." *Id.*, 227 Wis. at 188, 278 N.W. at 399. *See also Schaefer & Co. v. Industrial Comm'n*, 220 Wis. 289, 297, 265 N.W. 390, 393 (1936) (recognizing need to "distinguish carefully between medical or pathological disability and actual physical incapacity to work."). Here, as the Commission recognized, McGaw had a ripening affliction that, ultimately, caused his physical incapacity to work. Until that time, however, although his disease may have been a "medical or pathological disability," it "resulted in no wage loss," *see Montello Granite Co.*, 227 Wis. at 188, 278 N.W. at 399.

¶ 19. The distinction between symptoms that are not disabling and those that are is a logical application of the worker's compensation law. As the Commission opined in this case, "an employer cannot convert a nondisabling silicosis into a disabling condition with a 'date of disability' simply by requiring a medical examination, an x-ray or other diagnostic test." If employers *were* found to have established a "date of disability" for a worker when that worker was in their employ by directing the employee to see a physician, employers might choose not to so monitor their workers' health, hoping that the employee would get a job with another employer who would then be stuck with the "date of

disability." Additionally, an employer might *require* examinations with the hope of fixing in time an *early* "date of disability" in order to freeze the level of compensation in some circumstances. *See* Wis. Stat. § 102.03(4) ("The right to compensation and the amount of the compensation shall in all cases be determined in accordance with the provisions of law in effect as of the date of the injury except as to employees whose rate of compensation is changed as provided in ss. 102.43 (7) and 102.44 (1) and (5) and employees who are eligible to receive private rehabilitative counseling and rehabilitative training under s. 102.61(1m)."); § 102.01(2)(g) ("date of injury" means "date of disability"); § 102.11 (setting compensation levels by dates of injury). Neither alternative is consistent with the purpose of the worker's compensation law, which is to compensate employees suffering disabling disease as a result of their employment, *see Kohler Company*, 42 Wis. 2d at 408, 167 N.W.2d at 436 (" '[T]he primary purpose of the law as of all Workmen's Compensation Acts, is to compensate in some measure injured workmen for *loss of wage-earning power* sustained in the industry.' ") (emphasis in *Kohler Company*) (quoted source omitted), and also to protect their health.

¶ 20. Although Virginia Surety assumed Stainless Foundry & Engineering's worker's compensation risk on July 1, 1997, it is liable for the payments to McGaw because McGaw's "date of disability" was August 25, 1997, some two months later. *See Travelers Ins. Co. v. Department of Indus., Labor & Human Relations*, 85 Wis. 2d 776, 782, 271 N.W.2d 152, 155 (Ct. App. 1978) ("If a single employer has had successive insurers, liability is imposed upon the insurer whose policy was in force at the time the disability occurred."). While this

may seem unfair, it all evens out: "The company that had insured the compensation liability at the time disability occurred is the one that must pay the compensation awarded. This rule will work no injustice to any individual carrier or employer because the law of averages will equalize burdens imposed by this act among the employers and the compensation insurers of this state." *Employers Mut. Liab. Ins. Co. v. McCormick*, 195 Wis. 410, 415–416, 217 N.W. 738, 740 (1928).[1]

*By the Court.*—Order affirmed.

---

[1] In light of our resolution of this appeal, we do not discuss the alternative grounds for affirmance that the respondents have advanced. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed); *State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989) (cases should be decided on the "narrowest possible ground").