RACINE HARLEY-DAVIDSON, INC.,
Petitioner-Respondent,†

v.

STATE of Wisconsin DIVISION OF HEARINGS AND
APPEALS, Respondent,

HARLEY-DAVIDSON MOTOR COMPANY, INC.,
Participant-Appellant.

Court of Appeals

*No. 03–2628. Oral argument October 19, 2004.—Decided
December 22, 2004.*

2005 WI App 6

(Also reported in 692 N.W.2d 670.)

On behalf of the participant-appellant, the cause was submitted on the briefs of *Peter J. Stone* and *Kelli A. Taffora* of *Foley & Lardner LLP*, Milwaukee. There was oral argument by *Peter J. Stone*.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Paul R. Norman* and *Sarah A. Zylstra* of *Boardman, Suhr, Curry & Field LLP*, Madison. There was oral argument by *Paul R. Norman*.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. ANDERSON, P.J. Harley-Davidson Motor Company, Inc. appeals from a circuit court order reversing a decision of the Division of Hearings and Appeals (DHA) and finding that Harley-Davidson is subject to a good cause hearing pursuant to Wis. Stat. § 218.0116(8) (2001–02)[1] as a result of its decision to transfer a portion of Racine Harley-Davidson, Inc.'s (RHDI's) territory to another dealer. Harley-Davidson now argues that: (1) we should give "great weight" deference to the DHA's reasonable interpretation of Wis. Stat. ch. 218 and its application of that chapter to the parties' contract and (2) the DHA correctly determined that Harley-Davidson's alteration of RHDI's assigned territory did not constitute a modification of its "motor vehicle dealer agreement" and therefore RHDI was not entitled to a § 218.0116(8) good cause hearing.

¶ 2. As a threshold matter, we conclude that we must review the DHA's decision under the "great

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

weight" deference standard. Bearing this deferential standard of review in mind, we hold that the DHA properly concluded that the assignment of territories was not part of the motor vehicle dealer agreement, as that phrase is understood in WIS. STAT. ch. 218, and, therefore, when Harley-Davidson transferred a portion of RHDI's territory to a neighboring dealer it did not trigger WIS. STAT. § 218.0116(8). Accordingly, we reverse the order of the circuit court and remand for proceedings consistent with this opinion.

## Background

¶ 3. Harley-Davidson is licensed as a motor vehicle manufacturer and RHDI is licensed as a motor vehicle dealer pursuant to WIS. STAT. ch. 218. RHDI became a dealer of Harley-Davidson motorcycles in 1992.

¶ 4. The original 1992 dealer agreement between Harley-Davidson and RHDI was entitled "Harley-Davidson Dealer Contract." Under the agreement, RHDI's "Territory" included all of Racine county and no restrictions were placed on where or to whom RHDI could sell Harley-Davidson products.

¶ 5. In 1994, Harley-Davidson changed its policy regarding dealer territories. Using a uniform process applied to all dealers, Harley-Davidson began assigning zip codes to the dealer whose principal authorized location was closest to the centroid of the zip code, with a ten percent mileage credit not to exceed 1.5 miles to the dealer to whom the zip code was previously assigned. According to Harley-Davidson's Director of Dealer Development, zip code reassignments under this policy are frequent and routine and occur when new dealerships are created, existing dealerships relocate, or the post office changes zip code boundaries. Whenever a

dealer relocates, Harley-Davidson reviews zip code assignments to determine whether the distance between the relocated dealer and the centroid of each surrounding zip code has changed sufficiently to require a zip code reassignment.

¶ 6. In late 1993 or early 1994, Harley-Davidson presented RHDI with a modified agreement, which reflected the change in policy regarding dealer territories. The document entitled "Harley Davidson, Inc. Motorcycle Division Motorcycle Dealer Contract" provided that Harley-Davidson would grant to RHDI the right "[t]o purchase and resell at retail, primarily to persons residing or doing business in the primary market area assigned under this Contract (referred to in this Contract as "Territory")." Specifically, the document entitled "General Conditions of Sales and Service" provided: "Seller will assign Dealer a geographic area from time to time as Dealer's primary market area . . . . [I]t is understood and agreed that (a) Seller may modify, alter or adjust Dealer's primary market area at any time, based on Seller's good faith business judgment." As part of this assignment process, Harley-Davidson proposed that the zip code 53105, which includes the City of Burlington, be removed from RHDI's territory and reassigned to Uke's Harley-Davidson, a neighboring dealer located in Kenosha.

¶ 7. In response, RHDI filed a complaint with the DHA contesting the proposed modifications of the 1992 contract and alleging a violation of WIS. STAT. ch. 218. RHDI argued that the centroid of the Burlington zip code was actually closer to its principal place of business in Racine than it was to Uke's place of business in Kenosha. Harley-Davidson re-examined its distance calculation, determined that RHDI was correct, and assigned the zip code to RHDI. Harley-Davidson sent a

514

letter to RHDI confirming Harley-Davidson's agreement that the Burlington zip code would be assigned to RHDI's primary market area. RHDI's complaint was then dismissed.

¶ 8.    Subsequently, Mark Ulinski, the owner of RHDI, met with his district manager. At the meeting he was presented with the agreement, which he signed, and on a separate sheet of paper, a list of zip codes to be included in RHDI's territory. The Burlington zip code was included in this list. Ulinski has since stated that he would not have dropped RHDI's protest of the modification of its original dealer contract if Harley-Davidson had not agreed in writing to assign the Burlington zip code to RHDI's territory. The new contract was dated May 25, 1994, and was set to expire in December 1998.

¶ 9.    The dealer contract at issue was executed in December 1998 and was set to expire in December 2003. The document entitled "Harley-Davidson Motor Company Motorcyle Dealer Contract" confirms that geographic areas would be assigned from time to time as a territory and that Harley-Davidson could modify, alter or adjust the territory at any time based on its good faith business judgment. The document entitled "Harley-Davidson Motor Company General Conditions of Sales and Service" states, "Dealer's Territory is nonexclusive. Without limitation, Dealer recognizes that Seller may change its Territory if the change results from the establishment of an additional Harley-Davidson dealership or the relocation of an existing dealership."

¶ 10.    Since Harley-Davidson changed its policy regarding dealer territories, the Burlington zip code has been part of RHDI's assigned territory. The parties agree that this territory assignment has been periodi-

cally referenced in connection with Harley-Davidson's direct mail program. However, in 2001, Harley-Davidson advised RHDI that Uke's would be moving its principal location from a downtown Kenosha site to a new facility along Interstate 94 that is next to the secondary retail location it established in 1999. Harley-Davidson determined that Uke's new principal location would be more than 1.5 miles closer to the centroid of the Burlington zip code than RHDI. As a consequence, Harley-Davidson advised RHDI that the Burlington zip code would be reassigned to Uke's when the relocation was completed.

¶ 11.   In response to the removal of the Burlington zip code from its territory, RHDI filed an amended complaint pursuant to Wis. Stat. § 218.0116(8) with the DHA.[2] Section 218.0116(8)(a) provides:

---

[2] In its brief, RHDI sets forth in some detail the impact of losing the Burlington zip code for its territory. According to RHDI, the Burlington zip code produced the second highest sales in its territory in 2001. The reassignment of zip codes would reduce the forecasted Harley-Davidson market potential of RHDI's territory in 2005 from 391 to 343, while increasing the 2005 forecasted market potential in Uke's territory to 429.

RHDI's concern over losing the Burlington zip code was also prompted by a letter that Ulinski received in January 1994 in response to his request for additional allocation of product. In that letter, he was informed that because RHDI's allocation already equaled its defined market potential, his request for additional allocation would not be considered. As explained, the loss of the Burlington zip code from its territory would cause RHDI's market potential to decrease, thus hampering its ability to receive additional product allocation in the future.

In addition, RHDI would not be eligible to participate in Harley-Davidson's direct mail program or to be considered for a second retail location or alternative retail outlet in the Burlington zip code. At the time that RHDI was notified that the

> A manufacturer or distributor may not modify a motor vehicle dealer agreement during the term of the agreement or upon its renewal if the modification substantially and adversely affects the motor vehicle dealer's rights, obligations, investment or return on investment without giving 60 days written notice of the proposed modification to the motor vehicle dealer unless the modification is required by law, court order or the licensor. Within the 60–day notice period the motor vehicle dealer may file with the department of transportation and the division of hearings and appeals and serve upon the respondent a complaint for a determination of whether there is good cause for permitting the proposed modification. The division of hearings and appeals shall promptly schedule a hearing and decide the matter. Multiple complaints pertaining to the same proposed modification shall be consolidated for hearing. The proposed modification may not take effect pending the determination of the matter.

RHDI claimed that Harley-Davidson's stated intention to transfer the Burlington zip code from its assigned territory to Uke's after Uke's relocation to its new dealership facilities constituted a modification of the motor vehicle dealer agreement between the parties. Harley-Davidson filed a motion for summary judgment, seeking dismissal of RHDI's amended complaint. Harley-Davidson argued that RHDI's assigned territory was not contained within the four corners of the motor vehicle dealer agreement; therefore, a change in the composition of the assigned territory is not a modification of the dealer agreement.

---

Burlington zip code would be removed from its territory, it had an application pending for the establishment of a second retail location in the zip code. The decision to remove the zip code from its territory was effectively a rejection of the second retail location.

¶ 12. In January 2003, the DHA issued a final ruling on the matter, granting summary judgment in favor of Harley-Davidson and dismissing RHDI's amended complaint. The Administrator for the DHA concluded:

> 2. A motor vehicle dealer agreement for purposes of Wis. Stat. § 218.0116(8) is defined at Wis. Stat. § 218.0101(1). In the instant case the "Harley-Davidson Motor Company Motorcycle Dealer Contract" and the "Harley-Davidson Motor Company General Conditions of Sales and Service" together comprise the "motor vehicle dealer agreement."

> 3. The assignment of a territory by Harley-Davidson for RHDI is not part of the motor vehicle dealer agreement between Harley-Davidson and RHDI. Therefore, the alteration of RHDI's assigned territory by Harley-Davidson does not constitute the modification of the motor vehicle dealer agreement.

¶ 13. RHDI filed a petition for review of the DHA decision. The circuit court reversed the DHA's final ruling, concluding that the sheet of paper containing the zip code assignments was part of the dealership agreement and therefore the modification of the assigned zip codes triggered Wis. Stat. § 218.0116(8). Harley-Davidson now appeals.

*Standard of Review*

¶ 14. Because the scope of our review underpins our analysis, and our decision is largely driven by the degree of deference owed, we begin with consideration of the appropriate standard of review. Harley-Davidson urges us to accord the DHA's ruling "great weight" deference because it is the administrative agency

charged with reviewing motor vehicle dealer/manufacturer disputes under Wɪs. Sᴛᴀᴛ. ch. 218 and the agency has used its expertise over the years to uniformly interpret the statute in accordance with the policies it is meant to protect. RHDI, on the other hand, argues that we should review the DHA's decision de novo. RHDI maintains that de novo review is appropriate both because this case presents a pure question of contract interpretation, a question of law, and because the DHA has no special expertise or experience in interpreting Wɪs. Sᴛᴀᴛ. § 218.0116(8). We reject RHDI's arguments.

¶ 15. The interpretation of a contract is a question of law that is subject to de novo review. *See Deminsky v. Arlington Plastics Mach.*, 2003 WI 15, ¶ 15, 259 Wis. 2d 587, 657 N.W.2d 411. However, when we undertake review of an agency decision, there are three levels of deference afforded conclusions of law and statutory interpretation. *See Sauk County v. WERC*, 165 Wis. 2d 406, 413, 477 N.W.2d 267 (1991).

¶ 16. When we afford "great weight" deference to the agency's interpretation, we will sustain a reasonable agency conclusion even if an alternative conclusion is more reasonable. *Zignego Co., Inc. v. DOR*, 211 Wis. 2d 819, 823, 565 N.W.2d 590 (Ct. App. 1997). We give "great weight" deference to the agency's interpretation when all of the following conditions are met: (1) the agency was charged by the legislature with the duty of administering the statute, (2) the interpretation of the agency is one of long-standing, (3) the agency employed its expertise or specialized knowledge in forming the

interpretation, and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute. *Id.*

¶ 17.   In affording "due weight" deference to the agency's interpretation, we will not overturn a reasonable agency decision that comports with the purpose of the statute unless we determine that there is a more reasonable interpretation available. *Id.* at 823–24. We afford "due weight" deference to the agency's determination when it has some experience in an area, but has not developed the expertise that necessarily places it in a better position than a court to make judgments regarding the interpretation of the statute. *Id.* at 823.

¶ 18.   When we review an agency decision de novo, we give no deference to the agency's interpretation. *See Brauneis v. LIRC*, 2000 WI 69, ¶ 18, 236 Wis. 2d 27, 612 N.W.2d 635. De novo review is appropriate if any of the following is true:   (1) the issue before the agency is clearly one of first impression, (2) a legal question is presented and there is no evidence of any special agency expertise or experience, or (3) the agency's position on an issue has been so inconsistent that it provides no real guidance. *Id.*

¶ 19.   RHDI claims that this case is similar to *Wisconsin End-User Gas Ass'n v. PSC*, 218 Wis. 2d 558, 565, 581 N.W.2d 556 (Ct. App. 1998), where we held that an agency's interpretation of a contract was subject to de novo review. There, a large gas company imposed penalty tariffs on gas customers for their unauthorized use of gas during a period of interruption. *Id.* at 561–62. The gas company assessed the tariffs based on certain language contained in a penalty clause in the contract between the parties. *Id.* The gas customers challenged

the amount of the tariffs imposed, arguing that the gas company misinterpreted the penalty clause in the contract. *Id.* at 562–63. The gas customers petitioned the Public Service Commission (PSC) for the adjustment of the tariffs, but the PSC denied that request. *Id.* at 563. The circuit court reversed the PSC. *Id.* On appeal, the PSC argued that its interpretation of the contract language should be afforded "great deference." *Id.* at 563–64. We rejected that argument, concluding that the question presented involved a matter of contract interpretation—an area in which we have as much expertise as the PSC. *Id.* at 561–62.

> The assessment of a penalty tariff in this case is not an issue of statutory interpretation; rather, it is an issue of contract interpretation. Ordinarily reviewing courts do not defer to the decisions of administrative agencies when considering pure questions of law. Matters of contract interpretation come before this court with frequency, and it is an area of law in which we have a great deal of experience and expertise. Furthermore, the construction of contract terms is circumscribed by specific rules of law. On these bases, we conclude that an agency's construction of a contract is subject to de novo review by this court.

*Id.* at 565 (citation omitted).

¶ 20. This case is readily distinguishable from *Wisconsin End-User Gas Association.* This case, unlike *Wisconsin End-User Gas Association*, does not involve purely contract interpretation and the application of black letter contract law; rather, it involves the interpretation of a statutory scheme and the application of that scheme to a set of facts.

██

¶ 21. WISCONSIN STAT. § 218.0116(8), which was enacted in 1990, is part of the 1935 Wisconsin Auto

Dealership Law. *See* 1989 Wis. Act 292, § 3; *Forest Home Dodge, Inc. v. Karns,* 29 Wis. 2d 78, 85, 138 N.W.2d 214 (1965). Implicit in this law is the recognition of the gross disparity of bargaining power between the manufacturer of automobiles and the local retailer. *See Forest Home Dodge,* 29 Wis. 2d at 85. It was enacted in recognition of the long history of the abuse of dealers by manufacturers. *Id.* The purpose of the law is to furnish the dealer with some protection against unfair treatment by the manufacturer. *Id.* In general, the law sets forth an administrative framework for dealing with the relationship between auto manufacturers and auto dealers. *See id.*

¶ 22.  The legislature has entrusted the DHA with the difficult task of enforcing the statute, including WIS. STAT. § 218.0116(8), and its purposes. *See generally* WIS. STAT. §§ 218.0152, 218.0116(8)(b) and 227.43. To assist the DHA with the interpretation and application of the statute, the legislature chose to define the term "agreement." WIS. STAT. § 218.0101(1). This definition of the term "agreement," as it is understood within the context of WIS. STAT. ch. 218, applies to claims brought pursuant to § 218.0116(8). *See Bosco v. LIRC,* 2004 WI 77, ¶ 23, 272 Wis. 2d 586, 681 N.W.2d 157 ("[W]e read the language of a specific statutory section in the context of the entire statute.") *See also* § 218.0101 ("In ss. 218.0101 to 218.0163, unless the context requires otherwise"). Because the legislature saw fit to define the term "agreement," neither the DHA nor this court may turn to contract law to supply that definition. *See Bosco,* 272 Wis. 2d 586, ¶ 23 ("Terms that are specifically defined in a statute are accorded the definition the legislature has provided.").

¶ 23.  When Harley-Davidson changed RHDI's assigned territories, RHDI had the choice of going to

court and alleging a breach of contract or going to the DHA and alleging a modification of the agreement that was not based on good cause. RHDI has deliberately chosen to pursue its claims within the protective administrative framework offered by Wis. Stat. § 218.0116(8) rather than within a breach of contract claim in an adversarial judicial proceeding. Therefore, it is the statutory definition of the term "agreement," and not how it might be defined using contract law principles, that guided the DHA's analysis, and now must guide our own. Accordingly, the logic behind the *Wisconsin End-User Gas Association* court's holding that de novo review is mandated in cases of strict contract interpretation does not apply.

¶ 24.    While we find no published case in which the DHA has had the opportunity to interpret the definition of "agreement" within the context of a Wis. Stat. § 218.0116(8) claim, that is not a prerequisite to "great weight" deference. *See Virginia Sur. Co. v. LIRC*, 2002 WI App 277, ¶ 13, 258 Wis. 2d 665, 654 N.W.2d 306, *review denied*, 2003 WI 16, 259 Wis. 2d 102, 657 N.W.2d 707 (Feb. 19, 2003) (No. 02–0031). As the court has repeatedly stated:

> The test is not, however, whether [the agency] has ruled on the precise—or even substantially similar—facts in prior cases . . . . Rather, the cases tell us that the key in determining what, if any, deference courts are to pay to an administrative agency's interpretation of a statute is the agency's experience in administering the particular statutory scheme—and that experience must necessarily derive from consideration of a variety of factual situations and circumstances.

*Barron Elec. Coop. v. PSC*, 212 Wis. 2d 752, 764, 569 N.W.2d 726 (Ct. App. 1997). As evidenced by numerous

unpublished decisions, the DHA has considerable experience working with motor vehicle dealer agreements and the statutory scheme set forth in WIS. STAT. ch. 218. *See also In re Motor Vehicle License of All Star Rent a Car, Inc.*, TR-02–0030, TR-02–0044 (review of a denial of a renewal of a motor vehicle dealer license); *Dodge City of Milwaukee, Inc. v. Chrysler Corp.*, 94–H-852 (review of a dealer's protest of the establishment of a proposed dealership within the dealer's relevant market area); *Don & Roy's Cycle Shop, Inc. v. Kawasaki Motors Corp. U.S.A.*, No. TR-00–0047 (review of a complaint protesting the establishment of a new dealer within another dealer's relevant market area).[3] The DHA's frequent interpretations of ch. 218 are based on the expertise it has developed and provide uniformity and consistency in the application of the motor vehicle dealer law. Given these circumstances, we hold that the DHA's decision is entitled to "great weight" deference.

¶ 25. When an agency's conclusions of law are entitled to great weight deference, a court will refrain from substituting its view of the law for that of an agency charged with administration of the law and will sustain the agency's conclusions of law if they are reasonable. *Brown v. LIRC*, 2003 WI 142, ¶ 19, 267 Wis. 2d 31, 671 N.W.2d 279. Thus, a court should sustain an agency's conclusion of law even if an alternative view of the law is just as reasonable or even more reasonable. *Id.* An agency's conclusion of law is unreasonable and may be reversed by a reviewing court if it directly contravenes the words of the statute or the federal or state constitution, if it is clearly contrary to

---

[3] We note that these cases can be easily accessed at: http://dha.state.wi.us/home/default/htm.

the legislative intent, history, or purpose of the statute, or if it is without a rational basis. *Id.*

■■

¶ 26.   As explained, the DHA determined that Harley-Davidson's alteration of RHDI's assigned territory was not a modification of the "motor vehicle dealer agreement" and, therefore, Harley-Davidson did not violate WIS. STAT. § 218.0116(8). This conclusion is entirely reasonable given the circumstances of the parties' dealings and is in accordance with the statutory framework set forth in WIS. STAT. ch. 218.

¶ 27.   WISCONSIN STAT. § 218.0116(8) prohibits a manufacturer's unilateral modification of a "motor vehicle dealer agreement" without good cause, which is to be determined at a hearing held by the DHA. The term "agreement" for purposes of WIS. STAT. ch. 218 is defined at WIS. STAT. § 218.0101(1). "Agreement" means a contract that describes the franchise relationship between manufacturers, distributors, importers and dealers. Sec. 218.0101(1). Neither party disputes that both the document entitled "Harley-Davidson Motor Company Motorcycle Dealer Contract" and the document entitled "Harley-Davidson Motor Company General Conditions of Sales and Service" comprise the motor vehicle dealer agreement under the statute.

¶ 28.   As discussed in the DHA's ruling, the assignment of territory by a manufacturer to a dealer is an important component of the relationship between a manufacturer and a dealer. Indeed, WIS. STAT. § 218.0114(11) requires a manufacturer to assign an area of sales responsibility to each of its dealers. However, neither § 218.0114(11) nor any other provision

requires that the parties designate the dealer's specific area of sales responsibility in the motor vehicle dealer agreement.

¶ 29.   Furthermore, as the DHA observed, the precise description of the assigned territory is not essential to the franchise relationship. Harley-Davidson has written policies governing the alteration of the assignment of territory to its dealers upon the establishment of a new dealer or the relocation of an existing dealer. As part of this policy, Harley-Davidson routinely modifies dealers' assigned territories for various reasons, such as the creation of new dealerships, the relocation of existing dealerships and changes of zip code boundaries by the post office. There is no indication that the legislature intended for each modification of a dealer's assigned territory, when made under a uniform policy like Harley-Davidson's, to become the potential subject of a complaint pursuant to WIS. STAT. § 218.0116(8).

¶ 30.   Finally, the DHA reasonably concluded that the parties' dealings do not suggest an intention to include the list of RHDI's territory in the motor vehicle dealer agreement. In the previous document entitled "Harley Davidson Dealer Contract" the parties listed RHDI's assigned territory as Racine county. When Harley-Davidson switched from a system of using counties for assigning territories to dealers to a system of using zip codes, neither the document entitled "Harley-Davidson Motor Company Motorcycle Dealer Contract" nor the accompanying document entitled "Harley-Davidson Motor Company General Conditions of Sales and Service" describe the territories to be assigned to the dealer. In fact, the latter document states, "Without limitation, Dealer recognizes that [Harley-Davidson] may change its Territory if the change results from the

establishment of an additional Harley-Davidson dealership or the relocation of an existing dealership." This policy of not including specific zip codes in dealer agreements makes perfect sense given the apparent frequency with which the zip code assignments change.

¶ 31. RHDI responds that Wis. Stat. ch. 218 and basic contract law require the court to hold that the assignment of territories is part of the motor vehicle dealer agreement. RHDI argues that because the two other documents that comprise the dealer agreement reference the performance of certain responsibilities within a territory to be designated by Harley-Davidson, the parties intended the assignment of territories to be a part of the motor vehicle dealer agreement and it should be considered an implied term of its franchise agreement. RHDI further claims that any other reading and application of the statute, particularly its definition of the term "agreement," would contravene the intent of the legislature to use ch. 218 as a vehicle to "ensur[e] fair dealing by motor vehicle manufacturers towards their dealers."

¶ 32. First, as we have explained, we review the parties' agreement using the definition of "agreement" and the statutory framework for motor vehicle dealer agreements provided in Wis. Stat. § 218.0101(1) as our guide; we do not look to contract law to supply that definition. Second, while RHDI may advance a reasonable alternative to the DHA's interpretation and application of Wis. Stat. ch. 218, we emphasize that we are reviewing the DHA's decision under the guise of "great weight" deference. When we apply such a standard, we must affirm an agency's reasonable decision even if an alternative more reasonable interpretation of a statute is available. *Zignego*, 211 Wis. 2d at 823. As we have demonstrated, the language of the statute and the facts

of the case support the DHA's ruling. Furthermore, simply because the legislature intended for ch. 218 to protect dealers from manufacturer abuses does not mean that under no circumstances can the manufacturer prevail in a dispute under Wis. Stat. § 218.0116(8). There is no evidence indicating that Harley-Davidson removed the description of its dealers' assigned territories from the motor vehicle dealer agreement in order to avoid complaints under ch. 218. Absent such evidence we fail to see how the DHA's fact-specific finding that the assignment of territories was not an essential term in the franchise agreement between the parties contravenes legislative intent.[4] We therefore hold that the DHA's interpretation and application of ch. 218 should be sustained. The decision of the circuit court is reversed.

*By the Court.*—Order reversed and cause remanded with directions.

---

[4] In support of its argument that the DHA's holding runs contrary to the purpose of Wis. Stat. ch. 218, RHDI relies on *Nissan North America, Inc. v. Royal Nissan Inc.*, 794 So. 2d 45, 49 (La. Ct. App. 2001), in which the Louisiana Court of Appeals held that a manufacturer's alteration of the assigned territories of existing dealers was a modification of the respective dealer agreements. RHDI's reliance on *Nissan* is misplaced. In that case, unlike here, the assigned territories for each of the Nissan dealers were specified in their respective dealer agreements. *Id.* at 47 n.1 ("Each dealer agreement with the distributor outlines that dealer's area of responsibility, or [Primary Market Area]"). There is no indication that the court would have reached the same result if the outline of the assigned territories had been in a separate document.